# Court of Appeals.

April, 1904.

## THE PEOPLE v. ALBERT KOEPPING.

(178 N. Y. 247.)

1. MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon the trial of an indictment for murder reviewed and held sufficient to warrant a verdict convicting the defendant of the crime of murder in the first degree.

2. APPEAL—DISCRETIONARY ORDER.

Where the denial of a motion for a new trial upon the ground of the misconduct of a juror is, upon the facts as disclosed, discretionary with the trial court, the Court of Appeals, as a general rule, will not interfere.

APPEAL from a judgment from the Supreme Court, rendered June 17, 1903, at a Trial Term for the county of Orange, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Wilton Bennett for appellant. The evidence does not indicate that the crime of murder in the first degree was made out. The verdict rendered by the jury must, therefore, be set aside. (People v. Conroy, 97 N. Y. 62; People

v. Stokes, 53 N. Y. 174; People v. Barberi, 149 N. Y. 236; Layton v. People, 10 Abb. [N. C.] 261; 24 Hun, 659; People v. Beckwith, 103 N. Y. 360; Sullivan v. People, 1 Park. Cr. Rep. 347; People v. Brunt, 11 N. Y. S. R. 59; People v. Mangano, 20 Hun, 259.) The defendant herein was enti- tled to a new trial upon the ground of the misconduct of one of the jurors. (Hoard v. State, 15 Lea [Tenn.], 318; Jem- burg v. Sperry, 85 Ill. 561; McAllister v. Lilley, 21 Misc. Rep. 150; 7 N. Y. Supp. 69; Clark v. Richards, 3 E. D. Smith, 89; People v. Johnson, 110 N. Y. 144; People v. Kelly, 31 Hun, 228; People v. Schad, 35 N. Y. S. R. 148; People v. Corey, 148 N. Y. 494; People v. Koerner, 154 N. Y. 377; People v. Greenwald, 108 N. Y. 296.)

A. V. N. Powelson, District Attorney (A. H. F. Seeger of counsel), for respondent. The crime of murder in the first degree was proved by competent evidence beyond a reason- able doubt. (Shorter v. People, 2 N. Y. 193; People v. Kerrigan, 147 N. Y. 210; People v. Filipelli, 173 N. Y. 510; People v. Rodawald, 177 N. Y. 408; People v. Priori, 164 N. Y. 459; People v. Kennedy, 159 N. Y. 346.) The jury were justified in finding that the killing of the deceased was unjustifiable, and was with premeditation and deliberation on the part of the defendant. All the elements of the crime of murder in the first degree were made out. (People v. Ferraro, 161 N. Y. 375; People v. Pugh, 167 N. Y. 524.) The evidence fully justified a finding by the jury that the shooting was not done in self-defense. (People v. Kennedy, 159 N. Y. 346.) The defendant's motion for a new trial on the ground of the misconduct of one of the jurors was properly denied, on the ground that such misconduct was not conclusively shown. (Code Crim. Pro. §463, 465; People v. Menkin, 36 Hun, 90; Hartung v. People, 4 Park. Cr. Rep, 319; People v. Hartung, 17 How. 85; People

v. Carnal, 1 Park. Cr. Rep. 256; Trimble v. Territory, 71 Ariz. 932.)

GRAY, J.

The defendant was indicted for the crime of murder in the first degree, upon the charge of having, willfully and deliberately, killed John G. Martine by shooting him with a revolver. Being put upon his trial, he was found guilty, as charged in the indictment, by the verdict of a jury and judgment of death was passed upon him on June 17th, 1903.

I perceive no valid reason for our interference with this judgment; either in the commission of some serious error upon the trial, or upon a consideration of the course of that trial, with respect to its fairness and to a due regard to the defendant's legal rights. That the defendant killed the deceased he did not deny. His defense was that he had committed the act in self-defense. The wife of the deceased was present, and testified, and the conflict between her testimony and that given by the defendant was left to the jurors to decide, upon the credence they might give to either in the light of the facts and circumstances, which the evidence disclosed prior to and at the time of the homicide.

The defendant, a young man twenty-two years of age and German by birth, became a boarder in the house of the deceased ; whose family consisted of a wife of thirty-eight years of age and of four children, between the ages of eighteen and four. The deceased was forty years of age and worked as a glove cutter in an establishment in the village of Port Jervis; where was, also, his family residence. The evidence tended to establish that he was more or less addicted to intemperate drinking and, when under the influence of liquor, was apt to be quarrelsome. After having boarded a few weeks with the deceased, the defendant left, in consequence of some friction between them ; but he soon was

permitted to return and to remain for several months. On February 18th, 1903, the day before the homicide, the deceased ordered him to leave the house and a quarrel arose over the amount of his indebtedness. According to his testimony, which received corroboration from that of another witness, the deceased then threatened him with a pocket knife, in the course of the altercation, and a bystander took the knife away. The defendant left and went to the house of one Weiser, at a late hour in the evening, and asked to be allowed to remain that night. Weiser and his wife testified to his having said that he was chased by the deceased out of the house ; that he spoke abusively of the deceased and threatened to "fix" him. The next morning, he went back to the house of the deceased ; occupied himself in various ways for some time, and, while there, the latter returned home. According to the wife of the deceased, he told the defendant to hurry out of the house, and the latter said that he would. After the deceased had procured some articles, for which he had returned, he entered the dining room, removed some of defendant's clothes from a chair, sat down in it and commenced to clean his nails with his pocket knife. The defendant complained of his throwing his clothes around. Going into the adjoining parlor for some household purpose, while there, she heard the noise of the shooting. The deceased came into the hallway between the rooms, exclaimed "I am shot" and fell across the threshold of the parlor, dead. She had heard no other noise of any struggle and the dining room showed no evidences of any disturbance.

According to the defendant, he was preparing to take his departure, when the deceased returned, and, upon going for his clothes, which the latter had thrown around, was attacked by him with a knife. He, then, was handed a revolver by the wife of the deceased and was told to defend himself. He shot four times at the deceased to protect himself—the

first time to frighten him—and, afterwards, went out and gave himself up to the authorities. The autopsy revealed three bullet wounds; one in the breast and two in the back. The situation of the parties in the room was shown to have been such, as to evidence that the first two shots were fired directly at the deceased, one of them passing over his head and lodging in the wall, and that the last two shots were fired at him as he was leaving, or escaping, from the room. The defendant had three exits from the room, readily available to him. The pistol used belonged to the deceased and, according to his wife's evidence, had been kept for some time in the drawer of a piece of furniture, standing in the hallway near the defendant's bedroom on an upper floor. It appeared that he went upstairs after the deceased had returned home. The knife, with which the defendant said that the deceased had threatened him and which the wife said he had been using in cleaning his nails, was found in his open hand, as he lay upon the floor. Upon the argument counsel described it as a jackknife and it was referred to in the charge as a pocket knife.

The case, as it was submitted to the jurors, was one, clearly, for their determination. What conflict of testimony there was in the narration of events, between the defendant and the wife of the deceased, was for the jury to consider and to decide. There was evidence tending to affect the credibility of the latter's statements; as there was to affect the former's. The charge of the trial judge was perfectly fair and no objection was taken to it.

The defendant's counsel argues that the verdict was not warranted, because of the absence of any evidence to show a motive for the commission of the crime charged ; or to show premeditation and deliberation on the part of the defendant. It would be quite immaterial, if no motive had been shown, in view of the admission, and the proof, of the killing of the deceased ; but the evidence did furnish ground for the infer-

ence of a motive, in the defendant's desire to revenge himself for the treatment he had received. Premeditation was evidenced in the threats testified to have been made by the defendant against the deceased, on the previous evening, and both premeditation and deliberation were inferable from the evidence relating to his conduct on the morning of the homicide. He had returned to the house of the deceased, between nine and ten o'clock, and remained until about eleven o'clock, when the deceased, also, returned. Although knowing, as he says, that the deceased was in a quarrelling mood, he did not leave the house. When the deceased arrived, the defendant was in the kitchen and angry words passed between them there. He states that he then went upstairs and came down again, and the homicide, almost immediately, followed. The significance of the fact of his going upstairs, it may be observed, is in the opportunity afforded him of getting the pistol ; which, as the wife of the deceased testified, was kept in a stand near his bedroom door. The only reason he gives for going upstairs, when his clothes were in the dining room and when he was, at the moment, dressing in the kitchen, was "to tie his tie." In my opinion that was a frivolous and incredible explanation of a significant fact in the chain of evidence to show premeditation. Then he shoots at the deceased four times and, evidently enough, the first shot was directly at his object; for there was but one breast wound, which, according to the physicians, was fatal. The other two shots struck him in the back ; indicating, in view of the situation described, that the deceased was going from the defendant and trying to leave the room. Thus, the jurors had abundant justification for believing that the defendant committed the crime with deliberate intention. They could hardly, in my opinion, have come to any other conclusion, rationally. There was time for the defendant to reflect upon what he would do and to decide to accomplish his purpose, even if the jury believ-

ed his story that the wife handed him the revolver at the moment. However short the interval of time, the mind works with sufficient celerity for him to have been able to meditate a purpose to kill this man, instead of avoiding a conflict, as he might have done. He was the younger man, coming into a room where the older man was sitting in his chair. Behind, and to the right of, him were exits, readily available to leave the room, or the house, and his theory of defense, that the shooting was to protect his life, is without any foundation in the surrounding circumstances.

To justify the taking of life in self-defense, the person accused must show, not merely that he believed he was in imminent peril, but that the act was necessary in order to effect his escape. It was the defendant's duty to avoid the attack and there is not the slightest ground for an inference that he had done all in his power to avoid the necessity of killing. (People v. Kennedy, 159 N. Y. 346.) The question of deliberation and premeditation was one for the jury upon sufficient evidence and we should not be warranted in disturbing their verdict.

After the conviction, the defendant moved for a new trial, upon the ground of the misconduct of one of the jurors. Affidavits were read to the effect that the juror had publicly discussed the case, upon evenings during the trial, and that he had expressed an opinion of the defendant's guilt. The juror named denied, wholly, the allegations in the moving papers; his sworn statements were corroborated by those of others within whose observation he had been, and there were furnished to the trial judge affidavits, which evidenced the juror's good standing and reputation in the community. The denial of the motion, therefore, upon the facts as disclosed, was within the exercise of the court's discretion. With that exercise of discretion this court will not interfere,

as a general rule, and nothing in these facts would justify a departure from that rule.

I advise the affirmance of the judgment of conviction.

PARKER, Ch. J., O'BRIEN, BARTLETT, MARTIN and CULLEN, JJ., concur; HAIGHT, J., not voting.

Judgment of conviction affirmed.

## NOTE.

The celebrated Buchanan poisoning case involved a similar incident. There, after the jury had retired, one of their number, Paradise, collapsed. He was treated by a physician; and the physician was thereafter examined by Smyth, R., in the presence of the district attorney and of the defendant's counsel. After this examination Paradise was permitted to take his seat again in the jury box.

A motion for a new trial was made upon the ground that the jury had illegally separated; and upon the further ground that Paradise's mind was deranged. This motion was denied by Smyth, R. For his exhaustive and admirable opinion, see People v. Buchanan, 25 N. Y. Supp. 481.

Upon appeal, the Court of Appeals, after discussing the matter at length, said that the denial of the motion involved the discretion of the trial court, and that with that discretion they would not interfere.

People v. Buchanan, 145 N. Y. 1, at pp. 29-32; S. C. 9 N. Y. Crim. R. 428, at pp. 450-3.

The main Koepping case and the Buchanan case involve instances of misconduct or alleged incapacity on the jurors' part. Similar conditions arise where extraneous matters have been supposed to affect the jury. See an instance where one of defendant's witnesses was arrested for perjury during the course of the trial. (People v. Hayes, 140 N. Y. 484; 9 N. Y. Crim. 24.) See also a recent case where the judge had learned that an effort was being made to fix the jury, and where he expressed his regret that he should have to keep them locked up until the termination of the case.

(People v. Goslin, 67 App. Div. 16; 16 N. Y. Crim. 255; aff'd, 171 N. Y. 627, no opinion).

In both of these cases it was held that the episode afforded no reason for supposing that the jury had been unduly influenced. Upon the general subject, consult an editorial "Vague Suspicions against Jurors," N. Y. Law Journal, Jan. 27, 1902, which approvingly discusses the Goslin case, supra, as well as West Chicago St. Ry. v. Tuerk, 61 N. E. (Ill.) 1087; and People v. Mitchell, 34 Pac. R. (Cal.) 698.

R. C. T.

We are indebted to Robt. C. Taylor, Esq., of the New York bar, for the above note and several others which will appear in their proper connection.—Ed.