STATE OF MAINE *vs.* ARTHUR F. COX.

Cumberland.    Opinion, December 16, 1941.

154

*Frank I. Cowan, Attorney General,*

*Albert Knudsen, County Attorney of Cumberland County,*

*Richard S. Chapman, Assistant County Attorney of Cumberland County,* for the State.

*Clarence Scott,* of Old Town,

*Charles W. Smith,* of Biddeford,

*Hayden Covington,* of Brooklyn, New York, for respondent.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, WORSTER, MURCHIE, JJ.

WORSTER, J.   On appeal and exceptions.

At the September Term 1940, of the Superior Court held at Portland, in our County of Cumberland, the respondent, Arthur F. Cox, was indicted, tried and found guilty of the murder of E. Dean Pray, at Windham, Maine, on August 20, 1940. The case is brought here on appeal from the refusal of the presiding justice to grant the respondent's motion for a new trial, and on exceptions.

THE APPEAL.

On the appeal, the question is whether, in view of all the testimony in the case, the jury were warranted in believing beyond a reasonable doubt, and therefore in finding, that the defendant committed the homicide with malice aforethought, express or implied. *State* v. *Mulkerrin,* 112 Me., 544, 92 A., 785.

The respondent admitted at the trial that he fired at Pray the shots which caused his death, but claimed that they were fired without malice aforethought, in self-defense, and in defense of his companion, Kenneth A. Carr.

The jury might have found, from the evidence, that Arthur F. Cox was forty-nine years old, five feet and seven inches tall, and weighed about one hundred twenty-four pounds; that he had worked as a machinist and toolmaker in various parts of the United States; that he belonged to a sect called Jehovah's Witnesses, and that, from 1907 until he came to Portland in 1940, he devoted his spare time to doing what is called by the members of the sect "witness" work. This work is done, in part at least, by the witness going from door to door in a community, with a phonograph and records, and a bag containing booklets and perhaps other literature pertaining to the work of that sect. A record bearing what is called a message is played on the phonograph to those who will listen to it, and booklets and literature are distributed to those who will receive them. On arrival in Portland during the first part of August, 1940, he became connected with the local company of Jehovah's Witnesses at that place, and thereafterwards, up to the time Mr. Pray was shot on August 20, Cox devoted his whole time to the work carried on by that sect, of which he says he was an ordained minister, with credentials to that effect, issued to him by the Watch Tower Bible and Tract Society, by J. F. Rutherford, President.

Testimony tends to show that at about 8:30 or 9 o'clock in the morning of August 20, Cox left the headquarters of the local company of Jehovah's Witnesses, at 1 Myrtle Street.

in Portland, in company with Kenneth Carr and a woman named Verle Adams Garfein, for that part of Windham known as North Windham, to there do the work carried on by Jehovah's Witnesses. They traveled in Cox' car, which he drove. Each of them had a phonograph and at least one record, and a bag containing booklets and literature, and Cox had a map of the territory to be worked by them that day, which had been loaned to him by the person in charge at the headquarters at Portland. Cox also had in his bookbag a revolver (hereinafter sometimes referred to as a gun) which he had obtained during the previous month, and which because, he said, of an assault made on him in Portland, he had been carrying with him for about two weeks, for protective purposes.

Cox states that during the forenoon of August 20, while in a store in North Windham, he was told to get out of town in ten minutes. He then went back to a nearby information booth, where he had called earlier in the day, to see Mrs. Robbins, who was in charge of the booth, because, he said, "I had learned that there was a good deal of hostility there, and I wanted to know who could be depended upon to maintain the law and order there in case any disturbance arose for any reason." He did not find her until about two o'clock that afternoon, when she gave him the names of certain persons, including said Pray, who was then a deputy sheriff. Cox testified that at that time he had no knowledge that Pray had previously assaulted another Jehovah's Witness, or that one of them had been evicted by Pray by force, although Cox there learned from Mrs. Robbins that Pray had told them to get out of town. Cox did not go to see Pray, because he had heard that he was unfriendly, and since they were going down that way he knew that they would eventually call on him anyway.

According to Mrs. Robbins, Cox was nervous and perturbed when she saw him the second time. He was upset over something. He wasn't pleasant but he wasn't viciously angry; he wanted to see somebody in a hurry, somebody who had some

authority. She further testified, when questioned, as follows:

"Q. Did he say anything when you told him not to go down there, not to stay in town, not to go down to Pray's?

"A. He said if he started anything he could take care of him, because he had been ordered out of other towns and he knew how to take care of himself."

Cox, evidently referring to the threat he had received while in the store, testified that he told her "that we were going to finish this town in spite of some threats that had been made us."

Evidence indicates that after this conversation with Mrs. Robbins, Cox came out and got into his automobile, where Miss Garfein and Carr were waiting for him, drove a short distance in the direction of Portland, turned around, came back, and parked a little northerly of the booth, on the same side of the road. They then got out, and Miss Garfein took the easterly side of the road, while Cox and Carr crossed the road to make calls on the westerly side. Cox called at the Varney house, and Carr called at the home of Pray, which was the dwelling next northerly. Neither found anyone at home, and, coming from those houses, they met and walked along together, going northerly on the path which served as a sidewalk until they arrived at some point in front of Pray's garage, where Carr turned off to enter the garage. According to one witness, they parted half way between the pumps and the sign post. And it elsewhere appears that the easterly post, supporting the sign "Pray's Garage" is thirty feet and seven inches northerly of the center of the so-called "island" on which the pumps stood. Cox testified that he proceeded by the sign post a few steps and waited to see if Carr would get a reception.

According to the plan drawn to scale, which was used at the trial, the center of the pump island is about thirteen feet and nine inches westerly of an extension of the westerly line of the westerly graveled shoulder of the road. The southerly line of

the garage projected to the road would pass a little to the north of that island, the center of which is twenty-nine feet and five inches easterly of an extension of the easterly line of the garage.

This garage is irregular in shape, and is located on the same side of the road as the Pray house, and next northerly thereof. Its southerly line is about fifty feet long, and the end next to the street is about twenty feet wide.

It appears from the record that Carr entered the garage and proceeded toward the Varney automobile, which was standing in the southwesterly corner thereof, where it was being repaired. Pray was working underneath it and Varney was leaning in, assisting him. At the same time, Clyde M. Elder, an employee of Pray, was working underneath the Ward car, which was also standing in the rear of the garage, but northerly of the Varney car. Ward was standing near Elder. As Carr approached the Varney automobile, he had the phono-graph on his arm, and said to Pray, "How do you do? I have a message here. Would you like to hear it?" Pray replied, "Go on. Get to hell out of here."

The respondent and his witness Carr do not agree with the witnesses for the State as to what then happened, especially as to when or where Pray got the tire iron, or as to the position, attitude and conduct of the parties at the time of the shooting and immediately before.

According to Carr's testimony, he turned to walk out when told to go. As he turned, Pray picked up a tire iron and when Carr had walked about fifteen feet, came up and put his hands on Carr's back, shoved him, and he went out. Pray pushed him four or five steps, gave him a shove and hit him with some-thing. As Carr was going forward, he straightened up and swung around to defend himself. Pray was then about five feet behind him, with the tire iron raised, and said "he was going to knock our damned heads off." Just then Carr heard three or four shots and Pray started for the corner of the house, stumbling. When Carr straightened up he saw Cox standing

a little to his left and probably five or six feet from him. Pray was about six feet tall, and probably weighed one hundred eighty or one hundred ninety pounds, was swearing, raging mad, and close enough to strike Carr, but not to his knowledge within striking distance of Cox at any time that day.

According to testimony of Cox, he was standing between the road and a line drawn from the pumps through the easterly sign post, waiting to see if Carr would get a "reception." He saw Carr enter the garage and go to the rear of the building, and heard him say something. A man now known to have been Pray got out from underneath an automobile and said, "You can get to hell out of here." With a bar in his hand, Pray drove Carr out of the garage, and, said Cox, "it seemed as he got out to the door the man struck at him and hit him on the back or side here somewhere." When Cox saw Carr coming out of the garage, he thought Carr was in great danger and set the phonograph on the ground; both hands were free to operate the gun. Upon arriving at the door, Pray saw Cox, and said, "You get out of here, too," desisted in his attack on Carr, and in a white rage, with the tire iron in his hand, came on a tangent toward Cox just a second or two before Carr reached the pumps. When Pray, his arm upraised with the bar in his hand, had taken about four steps, Cox saw there was going to be danger, and was feeling in his bag. Pray said, "What have you got in that bag? . . . Give me that"; Cox said "Stand back" and when Pray was about six feet from him and within striking distance of Carr, Cox, fearing he would be killed or injured with the bar, fired the first shot point-blank at Pray, who did not take another step toward Cox but stood there with the bar in his hand. Cox said, "he was stunned, I guess, after the first shot." He stated that his "purpose was to make a thorough job of repelling," and he did not know the effectiveness of the gun he was using, so he fired two more shots because it appeared to him that it was necessary. Cox said, "There was danger. He had the bar up there in his hands" and also said he (Pray) "might have secured a weapon in a very short time

to destroy all three of us." At the time Cox fired he had not stepped back or started to leave. Cox said, after the shots were fired "I noticed that Pray was thoroughly repelled and there was no danger there, so I got down toward the car as rapidly as I could." Cox also testified that he did not go down to North Windham that day "asking for trouble"; that he had no ill-feeling or hatred toward Pray or anybody there.

The witnesses for the State give a different version of what happened, in some important particulars.

Francis H. Brown was seated about five feet inside the garage door when Carr entered. Brown testified that he saw nothing in Pray's hands when Carr was going out; that Pray put his hands—Brown thought both hands—on Carr's shoulders, and pushed him out the door; that when Carr got out to the pumps Pray told Cox and Carr to get out of there, and when neither moved, said "I will see about it," turned around, stepped three or four steps, picked up a tire iron inside of the garage and went just outside the door five or six feet, stopped, and said to Cox "What have you got in that bag there?" When Cox pulled out the gun Pray started forward, took four or five steps, and Cox shot him. Brown said it was hard to tell how many shots were fired—four or five—and that while Cox was shooting, Pray "turned around, kind of staggering and started for the front of his house."

Ellen Harriett Robbins, keeper of the information booth, anticipating there would be trouble, followed Cox and Carr at a distance. She testified that when Carr came out of the yard in a hurry, Cox took a few steps toward him, Carr turned around, and Cox started to shoot. At that time she had not seen Pray, because her line of vision was cut off by the porch or a part of the Pray house. From observations subsequently made, she testified that at the time of the shooting she could see, from the place where she was standing, ten feet westerly of the pumps, so if she could not then see Pray, he could not have been as near to Cox and Carr at the time of the shooting, as they testified he was.

She further testified the first time she saw Pray, he came out around the side of his house, and the next time she saw him he was on the ground where he had fallen.

Gertrude Ruth Pray, widow of the deceased, was sitting in an automobile parked northerly of the Pray house, between it and the garage. She testified that although she saw Carr enter the garage she did not see him come out, but saw him crossing the dooryard, walking rapidly toward Cox; they came together. Cox was in line of the pumps and sign post. Cox put his hand in his bag at the same time she saw Pray, who had taken about three steps outside the door and stopped. She did not hear anything said between them. Cox pulled the gun out of the bag, pointed it at Pray, and fired three or four shots. Pray turned partly around, dropped something, and ran toward the house, and when he got in front of the automobile in which she was sitting, she lost sight of him. She did not see Pray strike or attempt to strike anyone in that dooryard.

Clyde M. Elder testified that when he looked out from underneath the Ward automobile, where he was working when Carr entered the garage, he first saw Pray and Carr, together, in the garage, about eight or ten feet behind the Varney car, and approximately twenty-three or twenty-five feet from the the front door, for which they were headed. Carr was ahead and Pray closely following. Elder did not then see anything in Pray's hand, that he can remember. He did not see them when they reached the door. When Elder got within possibly six feet of the door, Cox was pretty well out by the road, probably in line with the pumps and the post that holds the sign. Pray was practically in the center of the dooryard, at a point marked on the plan which, according to plan measurements, is about thirteen feet and nine inches from the door. Elder stated that he couldn't tell whether Pray had anything in his hand at that time or not; after that Pray might have taken one step, but not more than two. As Elder walked out, Cox and Pray remained in the position just indicated. Elder heard Pray say

"And you get out of here, too. What have you got in that bag?" Then the firing began; he saw Cox fire several shots at Pray. Elder was then probably two steps or two and a half steps outside the garage. He stopped suddenly. Pray dropped back —stated in cross examination "a step or two" and in direct examination "three or four steps"—turned toward Elder, and was so near that Elder could probably have touched him if he had put out his hand. Elder ran toward a Ford automobile and he doesn't know in which direction Pray went but he staggered toward an automobile. He does not know where Carr was at the time of the shooting.

Perley W. Varney, who, with Pray, was working on an automobile when Carr entered the garage, testified he saw Pray pushing Carr by the shoulders while in the garage; that Pray did not have anything in his hands; that he saw Pray at the door, still walking; Carr was then ahead of him in the yard. When Varney got to the door, Pray was a few steps, say about ten feet, outside, standing still. He then had a tire iron in his hand, but Varney did not see him when he picked it up. At the same time, Varney places Carr somewhere near the pumps. When Pray was shot, he swung around, came toward Varney, who was standing about five feet from the southerly wall of the garage, and dropped the tire iron about ten feet from the door. Varney picked it up and ran after Cox and Carr; he caught up with them at the Cox car.

According to the testimony of both Elder and Varney, Pray, although loud and forceful, was not angry.

Deputy Sheriff McDonald testified that when he received the revolver from Varney, he examined it and found four shells had been fired and three had not.

Carr told Dr. Bickmore that evening that he had been hit with a piece of iron, but on examination the doctor found no marks or discolorations.

According to Carr's own testimony, he himself did not look for any marks, and does not know whether there were any or not.

Without further reviewing the testimony, which is voluminous, suffice it to say that a careful examination of the record discloses evidence from which the jury might have found that both Cox and Carr, at and immediately before the time of the shooting of Pray, were on his premises; that Pray had ordered both of them to leave; and that although they had had reasonable opportunity to do so without danger to themselves before Pray was shot, they had not done so; and that, at the time of the shooting, neither of them had the legal right to be on said premises; that whether they then had the legal right to be on the premises or not, it must have been reasonably apparent to Cox himself that he could have retreated without any increased danger to either himself or Carr before shooting Pray; that at the time of the shooting, Cox had no reasonable ground to believe that either he or Carr was in imminent danger of death or great bodily harm; and that, at the time the first shot was fired, Pray was in the neighborhood of fifteen or sixteen feet from Cox, and Carr was even farther away from Pray.

It is elementary law that questions of fact, including the question whether or not a homicide was justified under a plea of self-defense, and the question of deliberation and premeditation are for the jury, under appropriate instructions from the court. *People* v. *Koepping,* 178 N. Y., 247, 253, 70 N. E., 778.

It is also for the jury to determine what part of the evidence presented at the trial was credible and worthy of belief, as well as the relative weight of the testimony. *State* v. *Merry,* 136 Me., 243, 262, 8 A. (2d), 143.

Here we find that under proper instructions given by the court, the jury were warranted in finding that the respondent wilfully and deliberately killed Pray, with malice aforethought, which was fully and correctly explained to the jury, and so we would not be warranted in disturbing their verdict.

THE EXCEPTIONS.

The respondent excepted to certain instructions given, to

the refusal to give certain requested instructions, and to certain rulings made during the trial. Although he has presented thirty exceptions in all, yet only twenty-one were briefed in his written argument.

In discussing generally the law of self-defense, and what a slayer must do to justify the taking of human life, the court instructed the jury that:

"He must retreat as far as he reasonably and safely can before taking his adversary's life."

That statement is challenged by the respondent's 13th exception.

The correctness of a judge's charge to the jury is not to be determined from mere isolated statements, but from a consideration of the charge as a whole. *State* v. *Benner,* 64 Me., 267, 291; *State* v. *Wilkinson,* 76 Me., 317, 323; *State* v. *Day,* 79 Me., 120, 125, 8 A., 544; *State* v. *Murphy,* 124 Conn., 554, 1 A. (2d), 274.

And this record discloses that in addition to the statement to which the above exception was taken, the court, at the request of the respondent, instructed the jury:

". . . that he is not bound to retreat when to retreat would be dangerous and quite as dangerous or more dangerous than it would be to remain where he is. He is not required to run himself into greater danger, by retreating, than already exists."

And the jury were further charged:

". . . that the mere fact that the defendant Arthur F. Cox did not retreat as approached by E. Dean Pray on the occasion in question, does not take away his right of self-defense if without such failure to retreat you otherwise find that he was justified in shooting in self-defense as hereinbefore instructed."

There is a very pronounced conflict of authority, and many

decisions, on the question whether or not a person must always retreat when practicable, before he can justify killing an assailant in self-defense, but no useful purpose can be served here by attempting to analyze and classify those decisions.

A reference is made to 30 C. J., page 67; 18 A. L. R., page 1279, note; 2 L. R. A. (N. S.), page 49, note; 3 L. R. A. (N. S.), page 535, note; and 26 Am. Jur., page 258, *et seq.* where the conflicting views are set forth.

Suffice it to say that after careful consideration, we have arrived at the conclusion that where a man, armed with only a club or iron, attacks, on his own private premises, a stranger who is there armed with a firearm, but not on official duty, and who has been ordered to leave, the latter must, as a general rule, retreat when it is reasonably apparent to him as a reasonable man that he can do so without increasing the danger to himself or to one he may then be lawfully defending, before slaying the assailant; and if the slayer does not do so, then the killing cannot be justified under a plea of self-defense. *Commonwealth* v. *Ware,* 137 Pa., 465, 20 A., 806; *Pugh* v. *State,* 132 Ala., 1, 31 So., 727; *People* v. *Johnson,* 139 N. Y., 358, 34 N. E., 920; *People* v. *Kennedy,* 159 N. Y., 346, 54 N. E., 51, 70 Am. St. Rep., 557.

But the respondent contends (exception 22) that at the time of the shooting he was where he had a right to be, and, therefore, was not required to retreat.

Whether or not, in the instant case, any attack was made by Pray, or whether Cox and Carr, at the time of the shooting, were where they had a right to be, and if so, whether Cox, under the rule above given, should have retreated before firing, were all questions of fact to be determined by the jury under appropriate instruction from the court.

Even if the jury found that Cox had a right to then be on the Pray premises, that would not present an exception to the rule above laid down. *People* v. *Johnson,* supra, where one convict killed another in prison; *State* v. *DiMaria,* 88 N. J. L., 416, 97 A., 248, aff. 90 N. J. L., 341, 100 A., 1071.

The respondent takes nothing by his 13th and 22d exceptions.

*State* v. *Carver*, 89 Me., 74, 35 A., 1030, relied on by the respondent, is not in point. That is not a homicide case.

We have not overlooked *Beard* v. *United States*, 158 U. S., 550, 39 Law ed., 1086, 15 S. Ct., 962; *Rowe* v. *United States*, 164 U. S., 546, 17 S. Ct., 172, 41 Law ed., 547; and *Brown* v. *United States*, 256 U. S., 335, 41 S. Ct., 501, 65 Law ed., 961, 18 A. L. R., 1276, cited by the respondent. It is to be noticed that the case at bar is unlike those cases. In the instant case, Pray was shot on his own premises. In the Beard case, the deceased was killed on the land of the slayer. In the Rowe case, the killing occurred in a hotel office. In the Brown case, the deceased was shot on a post-office site, where the respondent was superintending the excavation work. Moreover, it is to be noticed that in the Brown case, the slayer in fact retreated twenty or twenty-five feet to get the revolver with which he killed the decedent.

And when we consider that the right to kill in self-defense is only founded in necessity, real or apparent, (26 Am. Jur., page 249,) we feel that the most salutary rule, and the one most in accord with the principles of humanity, is the rule approved in *State* v. *DiMaria*, supra. It is there said:

"The instruction complained of was that if the defendant had a reasonable apprehension that his own life was in danger or that he was in danger of serious bodily injury he had a right to defend himself even to the extent of taking the life of the decedent; but that the law required that he should retreat if he could safely do so, and that if he could have done so with reasonable safety and yet did not retreat, but instead fired at the deceased with the intention of killing him, or inflicting upon him a mortal wound, the homicide was neither excusable nor justifiable. The contention on the part of the plaintiff in error is that so much of the instruction as related to the

obligation to retreat was harmful error; the true rule being, as he insists, that where a man who is in a place where he has a right to be is attacked by another he need not retreat, although a way to escape injury by doing so is open to him, but is entitled to stand his ground and kill his adversary in order to prevent his adversary from killing him or doing him serious bodily harm."

But the court held that the instruction complained of was justified.

The 16th exception is to a part of the judge's charge covering nearly three printed pages, parts of which are in accord with some of the respondent's contentions, to the giving of which it is not to be presumed he complains. The exception is too broad. The particular statement complained of should have been pointed out. But, considering the importance of the case, the contentions stated in the bill of exceptions will be considered.

In this part of the charge, the court said, among other things:

"... Mr. Cox says that as Pray came out the door Pray addressed him and said, 'You, too, get out of here,' ... Now, if that is the fact, the same duty devolved upon Mr. Cox to leave those premises as devolved upon Carr to leave the garage, and if that direction was given to him when Mr. Cox was some twenty-nine feet away from the door of the garage, it was his duty to comply with that order and leave the premises. He says that he did not; that he made no effort to leave ..."

The respondent's contention that this statement amounted to an instruction that it was the duty of Cox to leave immediately cannot be sustained. The jury had been previously told that "Carr had a right to have a reasonable time in which to leave," and the effect of this charge is that Cox also had a reasonable time to leave, provided the jury should find that he

should have done so under instructions given in other parts of the charge, which must be considered as a whole.

Nor does this instruction constitute an expression of opinion by the court. A presiding justice may properly lay down the rule of law applicable to the facts as the jury may find them *(State* v. *Kimball,* 50 Me., 409, 418,) and that is just what the court did here.

This exception cannot be sustained.

So far as the 14th exception challenges the rule laid down by the court, relative to retreat, it avails the respondent nothing, for reasons already given.

Nor was there any error, as claimed in exception 23, in qualifying a requested instruction by adding, "The obligation to do what he reasonably could to avoid the use of his revolver existed." 30 C. J., page 73; 26 Am. Jur., pages 241, 257.

The court did not thereby inform the jury that a duty fell upon the respondent to entirely avoid using the revolver, but fully protected his rights in this respect by charging the jury that:

> "If . . . the defendant Arthur F. Cox was approached by the deceased E. Dean Pray in such a manner as to cause the defendant Arthur F. Cox to have in his mind a reasonable and well-founded belief that he was in danger of losing his life or in danger of suffering great bodily harm, then you will find that he was justified in shooting regardless of whether such danger was real or even though you of the jury may believe from after developments that the danger to Cox was only apparent and not real, because Arthur F. Cox was justified in acting on the facts as they reasonably appeared to him at the time of or before the shooting."

The court refused, except as already given, to give a charge similar in part to the one embraced in the last quotation, but to the effect that Cox was justified in shooting if he had a

reasonable and well-founded belief that Carr was in danger of losing his life or suffering great bodily harm. The exception (21) to that refusal cannot be sustained, for the jury were, in effect, so instructed, when they were charged:

"... I instruct you that Mr. Cox had the same right to protect Mr. Carr's life, if it was threatened, as he would have to protect his own if threatened . . .

"So, if you find from the testimony that Mr. Cox or Mr. Carr was in imminent danger of death or great bodily harm and if the elements of self-defense, under the rules which I have given you to apply, are found, then the respondent is entitled to a verdict of 'not guilty.' "

A presiding justice is not bound to repeat what has been substantially and properly covered in his charge to the jury, nor is he bound to adopt the particular language used in the requested instruction, if the jury had otherwise been properly instructed in accordance with law. *State* v. *Knight*, 43 Me., 11, 141; *State* v. *Pike*, 65 Me., 111; *State* v. *Smith*, 65 Me., 257, 269; *State* v. *Williams*, 76 Me., 480.

The respondent takes nothing by his 20th exception, which was to the refusal of the judge to charge the jury as follows:

"You are instructed that the defendant and his companion, the witness Carr, had the right of a reasonable opportunity to depart or leave the premises peaceably after being told by Pray to leave, and if such opportunity was denied either of them by a sudden or fierce assault the defendant had a right to stand and defend as you are hereinafter instructed."

This request was properly refused, because the duty to retreat, when retreat should have been made, is absolutely ignored in the request. *Hill* v. *State*, 194 Ala., 11, 69 So., 941, 2 A. L. R., 509, 515.

A requested instruction which is not, in its totality, sound

law, is properly withheld. It is no part of the duty of the court to eliminate errors in a requested instruction. *State* v. *Cleaves*, 59 Me., 298, 303, 8 Am. Rep., 422.

After giving a requested instruction relative to distributing literature from house to house, the court added the following sentence, which is challenged by the respondent's 19th exception:

"And you will also, in considering that, bear in mind that the respondent at the particular time when this trouble occurred was not himself distributing literature at the premises of Dean Pray."

It is too late, after verdict, to question for the first time the accuracy of any statement of fact in the charge to the jury. *State* v. *Wilkinson*, supra; *Smart* v. *White*, 73 Me., 332, 339, 40 Am. Rep., 356.

But, at the trial, the attorney for the respondent did not claim any misstatement of fact. He said:

"We take exception to that remark as being an instruction to the jury that he didn't have a right to be on the premises when it was a place of business and any person had a right to come there, even to impart information."

That statement of counsel was wholly unwarranted. Neither that statement of the court, nor the charge as a whole, is susceptible of that construction.

Nor can the statement complained of in this exception be construed as an expression of opinion of the court.

Calling attention to the existence or non-existence of evidence is not exceptionable as an expression of opinion (*State* v. *Means et al.*, 95 Me., 364, 50 A., 30; *Coombs* v. *Mason*, 97 Me., 270, 54 A., 728) even although an inference may be drawn from an allusion to some obvious and indisputable fact (*State* v. *Lambert*, 104 Me., 394, 400, 71 A., 1092; *State* v. *Jones et al.*, 137 Me., 137, 16 A. (2d), 103).

There is no merit in this exception.

The 17th exception is to a part of the judge's charge covering the equivalent of a whole printed page, but we apprehend that the respondent only complains of that part printed in his brief, which is as follows:

"All witnesses might readily have been confused as to the exact number. But the State says, as I understand it, that when they took the revolver from Mr. Cox there were four empty shells and three which had not been exploded, and the State says that he fired four times. He says he fired three. Now, one or two of those shots missed the mark apparently, because but two wounds were found in Mr. Pray. Does that fact, that certain of the shots missed, have or does it not have any effect upon the probability of the distance which the parties were apart when the shots were fired? If Mr. Cox, as he says he was, was firing point-blank at a man five or six feet away, is it likely that any of the shots would have missed? Or was he far enough away so that some of them did miss? I simply call your attention to these facts—to the testimony, rather—for what bearing it may have when you come to consider the case."

The respondent's contention that this was an expression of opinion by the court, and amounted to a permission to the jury to speculate because the evidence does not show which of the shots missed, cannot be sustained.

It is certainly proper for a judge to instruct a jury to apply to the testimony of witnesses the tests of consistency and probability, by stating both affirmatively and interrogatively the various propositions and incidental questions to be considered and determined by them. *State* v. *Day*, supra; *State* v. *Means et al.*, supra; *State* v. *Jones et al.*, supra.

And the court went no further than that in the charge complained of in this exception. He even premised that part of his charge which includes the part last quoted with the words "You may or may not regard it as bearing upon the facts in

the case," thus plainly indicating that he was expressing no opinion himself, but merely calling the attention of the jury to this aspect of the case, for their consideration, as he had a perfect right to do. The respondent takes nothing by this exception.

Respondent's 15th exception is to a statement in the charge that "the testimony of Mrs. Robbins is important"; but as soon as the attention of the judge was called thereto, and before the jury retired, he said:

"I will withdraw that statement, if made, and state to the jury that the importance of that testimony is entirely for them. I did not intend to express any opinion as to its importance. That is a matter for the jury."

A presiding justice has a right to correct an instruction to the jury before they retire. *State* v. *Derry*, 118 Me., 431, 108 A., 568.

And in considering a case, the jury are in duty bound to ignore any part of the charge withdrawn by the court. *State* v. *Hood*, 63 W. Va., 182, 59 S. E., 971, 15 L. R. A. (N. S.), 448, 129 Am. St. Rep., 964.

The correction having been made, the jury could not have been misled, and the respondent's 15th exception is without merit. See *State* v. *Richards*, 85 Me., 252, 255, 27 A., 122.

The 25th exception is to the refusal of the judge to charge the jury as follows:

"You are instructed that if under the instruction here-inbefore given you find or have reasonable doubt that the defendant was justified in firing the first shot, then you will find that he was justified in continuing to shoot until it was apparent to him that the real or supposed danger to his life and body had ceased."

And the 26th exception is to the refusal to give another instruction in the same language as the one last quoted, with

the exception that in place of the last six words, the following words were substituted:

". . . the life and body of Kenneth Carr had ceased."

These requests were properly refused, because fatally defective, for the following reasons:

(1) The words "will find" as used in these requests, amounted to a command to the jury to find a fact. The court could not so command.

(2) Danger "apparent to him," as indicated in these requests, is not the test. What appears to be the prevailing view in America requires "a reasonable apprehension and belief such as a reasonable man would, under the circumstances, have entertained," to justify killing a man in self-defense. 26 Am. Jur., page 253.

(3) As drafted, the requests do not make sense. A reasonable doubt that the respondent was justified in firing the first shot could not possibly justify him in continuing to shoot.

Moreover, the respondent cannot complain of the refusal to give these instructions, because the court charged the jury that:

"Arthur F. Cox was justified in acting on the facts as they reasonably appeared to him at the time of or just before the shooting."

The 27th exception is to the refusal of the presiding justice to charge the jury as follows:

"You are instructed that if you believe from the evidence or have reasonable doubt that the defendant had been previously assaulted in Portland and was carrying the gun as a precaution against repetition of similar assault upon him, then you will consider such fact as evidence that he did not have malice aforethought in shooting E. Dean Pray on the occasion in question."

This instruction was properly refused, because the request is fatally defective. The use of the words "will consider" amounted to a command which the court could not properly give.

Moreover, even if Cox was armed only for protection when he went to North Windham, that would not be "evidence that he did not have malice aforethought in shooting E. Dean Pray on the occasion in question," for such malice aforethought might have existed for the first time after he got into difficulties on his arrival in the vicinity of the Pray garage, and only a few moments before the fatal shots were fired. *Allen* v. *United States*, 164 U. S., 492, 41 Law ed., 528, 17 S. Ct. Rep., 154; *Commonwealth* v. *Tucker*, 189 Mass., 457, 76 N. E., 127, 7 L. R. A. (N. S.), 1056; 26 Am. Jur., page 186 *et seq.*

The 18th exception is to that part of the charge where the court said:

"And the fact that Mr. Carr declined at times to advise the authorities of what he understood the facts to be, is only admissible for one purpose — as bearing upon the interest he might have in the result. Was he trying by his silence to shield Mr. Cox, or not? If he was trying by that silence to shield him, was that because of the interest which he had in the case and the desire that Mr. Cox should escape punishment?"

At the trial, and before the jury retired, the attorney for the respondent said:

"I take exception to the Court's instruction to the jury that they could consider the silence of Carr as evidence of the fact that he was shielding the defendant Cox, when the evidence does not show that he was, as being a comment upon the evidence—I mean as being an expression of opinion."

It is perfectly apparent that the jury were not told in that part of the charge last quoted that they could consider the

silence of Carr as evidence of the fact that he was shielding the defendant Cox. A mere reading of that quotation from the charge is sufficient to demonstrate the fact that no opinion whatsoever was expressed by the court therein, and since this exception was then limited to the claim that this charge constituted an expression of opinion by the court, it cannot be sustained.

The 28th exception is to the refusal of the presiding justice to charge as follows:

"You are instructed that if you believe from the evidence or have reasonable doubt that the defendant had been previously assaulted in Portland by a man larger than he and who assaulted Cox and injured him, then you will have a right to take that into consideration in reaching a conclusion as to whether the defendant believed at the time E. Dean Pray started toward him that he was again in danger of receiving similar injury when approached by E. Dean Pray."

In support of this exception, the respondent relies on *State v. Doris*, 51 Ore., 136, 94 P., 44, 16 L. R. A. (N. S.), 660, 668.

In the case last cited, the defendant was asked what, if any, reason he had, at the time the deceased attempted to strike him, to think that he was in danger of receiving great bodily harm, and as to why he thought he had to be armed for his own protection, which, on objection, was excluded. And the court refused to give to the jury an instruction similar to the last mentioned request of the respondent in the instant case. On appeal, the court held that the evidence should have been admitted, and that an instruction of similar import to that requested should have been given.

But in the instant case, Cox was allowed to testify that he feared serious injury from the hands of Pray; that he had suffered injuries in an assault previously made on him in Portland by a large man, who finally got the worst of it when Carr came to Cox' assistance. Cox was also allowed to state why

and when he bought the revolver, and that since that assault he had been carrying it in his bag for protective purposes only.

And the court instructed the jury:

"... that a person who arms himself not for the purpose of aggression but as precaution against possible attack and for the sole purpose of anticipated need for self-defense may use such arms in self-defense where he does nothing wrongful to provoke or cause the difficulty. ... provided the other elements necessary to establish the right to self-defense exist."

The jury were further charged:

"... that the mere fact that the defendant Arthur F. Cox had a gun or dangerous weapon and upon the occasion in question used it does not take away his right of self-defense, if without that fact you otherwise find that he was justified in shooting as hereinbefore instructed."

That part of the charge hereinbefore considered under the 14th exception was sufficiently broad to include all reasons which might have caused "Cox to have in his mind a reasonable and well-founded belief that he was in danger of losing his life or in danger of suffering great bodily harm," and the court was not in duty bound to give the requested instruction dealing with an alleged particular cause.

This exception cannot be sustained.

The 8th exception is to the refusal of the presiding justice to grant a motion for a mistrial, because the county attorney asked Carr: "You didn't have your gun with you that day, did you?" Upon the respondent objecting thereto, the court said: "The question may be struck out and the jury will disregard it." And it must be presumed that the jury followed that instruction. *Commonwealth* v. *Godis*, 266 Mass., 195, 196, 164 N. E., 923.

Whether or not a mistrial should be ordered rests in the sound discretion of the presiding justice, whose decision will

not be overruled unless manifest wrong or injury results. *State v. Steneck*, 118 N. J. L., 268, 192 A., 381, aff. 120 N. J. L., 188, 198 A., 848, cer. den., *Steneck v. State*, 305 U. S., 627, 83 Law ed., 401, 59 S. Ct. Rep., 89.

In the instant case, no manifest wrong or injury resulted from the ruling complained of. There was no abuse of judicial discretion. The ruling was right. There is no merit in this exception.

The 9th exception is to the refusal of the presiding justice to grant a mistrial on account of alleged prejudicial conduct of the county attorney in cross examining Cox relative to the purpose for which he obtained the revolver. In direct examination, Cox had testified, in substance, that he had obtained the revolver in Washington, D. C., the month before; that he purchased it because he and others were planning to drive by automobile to the Detroit convention of Jehovah's Witnesses, traveling day and night, and he wanted it "for protection against robbers and someone that might stop us on the way, interfere with us."

The following appears in the record of the cross examination of Cox by the county attorney:

> "Q. You didn't get that gun because you expected a little trouble out in Detroit, did you, Mr. Cox?
>
> "A. No, sir.
>
> "Q. There was, is it not true, considerable opposition . . ."

The attorney for the respondent having interrupted with an objection, the court said:

> "You have a perfect right to object."

The attorney for the state then asked Cox:

> "Q. Is this not true, Mr. Cox, that you took that gun with you to Detroit, not only for protection on the road, but for what protection you might need while in danger at the convention because of conditions in Detroit?"

Objection having been raised thereto, the court ordered the last part of the question struck out.

There was no error in refusing to grant a mistrial on this ground, and the respondent takes nothing by his 9th exception.

In this state there is no statute or rule of court requiring the presiding justice, on motion, to segregate the witnesses during the trial. Whether or not the witnesses should be segregated in a given case, rests in the sound discretion of the court, to whose ruling an exception will not lie unless it appears that there has been an abuse of discretion. *State* v. *Chapman,* 103 Conn., 453, 130 A., 899; *State* v. *Peters,* 90 N. H., 438, 10 A. (2d), 242; *Zoldoske* v. *State,* 82 Wis., 580, 52 N. W., 778, 786.

There was no error in the ruling in the instant case; the respondent's 2d and 3d exceptions cannot be sustained, for the record shows no abuse of discretion in refusing to order the witnesses segregated.

It appears that about a month before the shooting, a Jehovah's Witness named Gooch was playing a record in Pray's garage, when he was forcibly ejected by Pray, and the record broken. The respondent offered in evidence a similar record, and desired to have it played "before the jury to show that there is not one word on it that would incite any reasonable person to do violence." The record was excluded, and permission to play it before the jury was denied. To that ruling, the 7th exception is directed. The ruling was right. It does not appear that Pray even heard the words of the record Gooch played. Pray entered the garage while the record was being played, and apparently Gooch was ejected before it had been fully played. In any event, it would have no bearing on this case, because it does not appear that Pray knew that the record Carr offered to play was like the one Gooch had.

But the respondent was allowed to show, and did show, the details of the trouble Pray had with Gooch, at the time the latter played the record in the garage, and the jury were expressly charged that they could consider the fact that Pray

"had previously assaulted one of Jehovah's witnesses, and the fact that he had previously threatened to assault Jehovah's witnesses, as bearing upon the question of who was the probable aggressor upon the occasion in question."

The 30th exception is to the refusal of the presiding justice to charge the jury as follows:

"You are instructed that you can consider the fact that the defendant believed that the ALMIGHTY GOD through His written Word the Bible taught the defendant that he should exercise his right of defense of himself while worshipping Almighty God from assaults, to show that he did not have malice aforethought."

The request was properly refused, because, as presented, it was premised upon a positive assertion of fact as to the belief of the respondent. It was not within the province of the court to tell the jury they could "consider the fact that the defendant believed" any particular religious doctrine.

Furthermore, the jury had been previously fully instructed as to the law of self-defense, and it is a well settled general rule that a religious belief is not a defense to a prosecution for a violation of the law of the land. 26 Am. Jur., page 229; *Reynolds* v. *United States*, 98 U. S., 145, 25 Law ed., 244; *State* v. *Sanford*, 99 Me., 441, 59 A., 597.

A further consideration of the case is unnecessary. After examining all of the exceptions, including those not specifically covered in the respondent's brief, we find none that should be sustained. The mandate is

*Exceptions overruled.*
*Appeal dismissed.*
*Motion for new trial denied.*
*Judgment for the State.*
*Case remanded for sentence.*