STATE OF MAINE *vs.* VAUGHN McNAUGHTON.

Aroostook.     Opinion, February 20, 1933.

*J. Frederic Burns*, County Attorney for the State.
*Jasper H. Hone*,
*A. S. Crawford*, for respondent.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, JJ.

BARNES, J.    This is a criminal appeal, on exceptions. Respondent was tried on an indictment charging that at Presque Isle, in

this state, on the seventh day of October, 1931, without lawful authority, license or permission, he sold three gallons of alcohol to Chester N. Marr.

Respondent admitted sale by him of the alcohol, at the time and place alleged, but denied that he sold it to Marr, claiming he made the sale to one Tufts. He testified that between two and three o'clock, on the afternoon of that day he had negotiated with Tufts, at a grocery store in Presque Isle, for the sale of a three-gallon can of alcohol.

The State presented as witnesses, Chester N. Marr, of Bath, one of a Prohibition squad working that fall in Aroostook County, Edwin R. Goodenow, of Kittery, a Federal Prohibition officer, and Thomas W. Kempton and Dana B. Tufts, local deputy sheriffs. Messrs. Tufts and Goodenow testified that on the afternoon of October 7, 1931, they, with Marr and Kempton, in two cars, left Presque Isle at 1.45 in the afternoon and drove to Houlton, where they remained until about 7.30, when they left Houlton on their return to Presque Isle.

Goodenow testified that upon orders from his superior the four officers attempted to purchase alcohol of respondent that night.

The officers testified that Tufts drove them, in his car, to respondent's house on Chapman Street, in Presque Isle, shortly before 9.30 at night and that Tufts alone left the car and entered the house.

Tufts testified that he did not see respondent on October 7 until at the evening call; that he had known respondent for seven years; that he found him at home on the evening of October 7, 1931, and, as to the agreement of sale, "I asked him if he had any alcohol. . . . He said he had a plenty. I told him I had some friends at the camp at Echo Lake who would like to have a three-gallon can. He said he would be glad to deliver it anywhere, any time. I asked him if he would deliver it that night and he said yes. I gave him directions how to reach the camp. He told me to go to the camp and, if he wasn't there in half an hour, to come out to where the road turned off from the main Houlton road, and wait for him there." It is undisputed that the officers went to the camp, some miles south of the village, and that shortly after ten o'clock Tufts, with Goodenow and Marr, returned from the camp so far as to the

junction of the crossroad with the Houlton road and there met the respondent.

Respondent assured them he had the liquor in his car but refused to deliver it until he should arrive at the camp.

They then proceeded to the camp; respondent carried the three-gallon can into the main room of the camp, opened it and served five or more drinks.

As to who made the purchase, we find in the record that, when he found respondent at the junction of the roads, Tufts offered to take delivery there, but respondent insisted that he would carry the can to the camp and deliver it there; that in the camp yard Tufts offered to take the can and pay for the liquor.

But respondent carried the can in, placed it where Marr ordered, and Marr testified that he paid respondent, placed the thirty dollars in his hand; that twice, before the liquor was carried into the camp, he had offered to pay for it; that in the camp he offered to pay for it; that respondent refused to accept the money until after the first round of drinks; that shortly after that he, Marr, placed the thirty dollars in respondent's hand and he then accepted it.

Kempton testified that he saw Marr pay respondent.

Goodenow testified that twice, on the road, Marr offered to pay for the liquor, and once in the camp, and that on the second attempt by Marr to pay in the camp, the money passed from Marr to respondent.

Respondent's testimony, on direct examination, was that Mr. Marr produced the money, and this is his version of the procedure in payment:

"Q. And what did he (Marr) say or do?

A. First he asked me how much the alcohol was, and I told him thirty dollars. He said, 'That is kind of steep, isn't it?' I didn't make him any answer.

Q. What did he finally do with the thirty dollars?

A. Laid it on the table.

Q. What did you do with it?

A. We had a round of drinks and then I took it and put it in my pocket."

Much testimony followed, as to conversation at the camp during respondent's visit, which was prolonged until midnight.

At the end of the testimony respondent's counsel moved for a directed verdict of not guilty.

This the Court refused, and exception was taken.

From the whole evidence it must be the Court was satisfied that respondent was guilty as charged in the indictment. No course was open to him but to submit the question to the jury.

During the trial his counsel asked respondent, "Did you sell anything to Mr. Marr on that October 7th last?"

The Court then said: "That is excluded in that form. The question to whom the sale was made, Mr. Crawford, is a question of law. He can tell all the facts and circumstances, but it is not for him to say whether the sale was made to him or not."

The Court was manifestly right. This exception fails.

Again respondent was asked, "If Mr. Marr had asked you to sell him anything on October 7th, would you have sold him any alcohol?"

Upon objection this question was excluded, and properly.

The question is not entirely clear, but its answer, if in the negative, would probably have had no probative force with jurors of ordinary intelligence. The issue was not what he would have done, but what he did, and the question was properly excluded.

During the hours spent in the camp, while all agree that not more than two drinks were taken by any, and that some of the company drank nothing, the respondent is said to have told in detail of the risks he ran in running rum into Maine from Canada. In particular he is said to have reported that he was at times fired upon by officers.

It is in the record that he offered to employ Kempton to travel with him at ten dollars per day, thirty dollars a trip, to serve as his gunman and return shot for shot. The State's witnesses testified that respondent asked them to go into the yard and look at bullet holes in his car.

Before closing his case, respondent's counsel said he "would like to move that the jury be permitted to view the car."

Whereupon the Court remarked, "I see no object in wasting time for that, Mr. Attorney. It is immaterial."

Respondent had denied making talk about bullet holes in the car; had testified that he had polished it since October 7, and observed none, and that the car was on the street near the courthouse.

To grant a view of premises is common in our practice; of chattels not commonly requested.

To grant or deny such a request is within judicial discretion. Refusal here was not wrong.

*Exceptions overruled.*
*Judgment for the State.*