**STATE of Maine**

v.

**Joseph A. RYDER.**

Supreme Judicial Court of Maine.

Nov. 14, 1975.

**2**

Foahd J. Saliem, Asst. Atty. Gen., Augusta, Donald A. Spear, County Atty., Bath, for plaintiff.

Robert N. Walker, Basil A. Latty, Yarmouth, David Klickstein, Brunswick, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

A jury in the Superior Court (Sagadahoc County) found the defendant guilty of voluntary manslaughter in the shooting death of Harry L. Cressey on September 27, 1972. On appeal, the defendant assigns three prejudicial errors to the trial court's conduct of the case as follows:

### I.

Refusal to permit a witness, under cross-examination by the defendant, to relate an exculpatory statement by the defendant;

### II.

Erroneous instruction to the jury on the law of self-defense;

### III.

Jury instructions containing an impermissible expression of the court's opinion on the facts of the case.

We conclude that of the assigned errors, none constitute grounds for a reversal.

The essential facts which emerged at trial are as follows:

Harry Creesey operated a gas station in the city of Bath. He had been married to Beverly Cressey for some eight and one-half years, but they were separated for four years prior to his death. It was generally known in the community that Cressey was given to violent fits of temper which were typically brought on by the consumption of alcohol. Much of his threatening and violent behavior was directed at his estranged wife, their children, and the defendant who, at least in the eyes of the deceased, was the current object of his wife's affections.

The defendant, a resident of New Jersey, but frequent visitor to Maine, had known Mrs. Cressey for approximately seventeen years, and had spent a considerable time during September, 1972, in Mrs. Cressey's company in the Bath area. Cressey was displeased about the relationship between his estranged wife and the defendant, and the defendant himself, although he had never met Cressey, was aware of the latter's animosity toward him.

On September 5, 1972 Mrs. Cressey, accompanied by the defendant, purchased a .38 caliber revolver from a pawnshop in nearby Brunswick. Several days later, she discovered that the gun was "missing", and reported this fact to the Brunswick Police Department. This revolver was the weapon used to kill Cressey.

On September 27, the evening of the shooting, Ryder appeared at Cressey's gas station at approximately 6:30, bearing beer and a bottle of whiskey. The two men drank and talked in Cressey's office for close to three and one-half hours. They

were occasionally joined by one Duane Alexander, a sixteen-year-old attendant at the station. The conversation centered upon the years both Cressey and the defendant had spent in the military service, but the real purpose of the confrontation was to arrive at some understanding concerning Ryder's relationship with Mrs. Cressey. According to Alexander, Ryder told Cressey that he did not want to get shot over the whole affair, and Ryder declared that he would stay away from Cressey's estranged wife.

As Cressey and Ryder talked, Alexander was engaged in cleaning and reassembling a shotgun belonging to him, which he apparently kept at the station. Cressey rendered some assistance in reassembling the gun. Alexander finished overhauling the shotgun at about 8:30 p. m., and placed it in a corner near the desk where Cressey was sitting. According to Alexander, the shotgun was loaded with a rock-salt shell, although a witness who arrived at the gas station shortly after the shooting testified that he found the shotgun unloaded.

Alexander closed down the station sometime between 9:00 and 9:30 p. m. and left the premises. He returned in a few minutes with a sandwich for Cressey, who was still involved in conversation with Ryder.

Shortly after Alexander left the station for the second time, Ryder got up to leave. At this time, according to Ryder, Cressey became violent and punched him in the mouth. Ryder responded by hitting Cressey twice in the face, and then, the defendant testified, Cressey threatened to kill him and picked up the shotgun from behind the desk. Ryder drew the revolver, identified as the one purchased by Mrs. Cressey, and shot Cressey at close range, twice in the head and once in the chest. Any one of the shot wounds would have been sufficient to cause Cressey's death.

The defendant was arrested later on the night of September 27 at his room in a nearby motel, on the basis of information furnished by Alexander and a passerby who heard the gunshots and observed Ryder's automobile leaving the gas station.

The defendant was indicted by a Sagadahoc County Grand Jury for murder.

I.

The court's refusal to admit testimony as to an exculpatory statement by the defendant.

The defendant's brother was called as a witness by the State and testified on direct examination concerning a conversation he had with the defendant while the latter was incarcerated before trial in the Cumberland County Jail. The witness testified, among other things, that the defendant told him, "Cressey threatened to kill the kids, to kill her and kill him, and said he was going to start on him right away." On cross-examination by the defendant's counsel, the following exchange took place:

MR. LATTY: You say you came to Maine and did talk with Joseph Ryder?

WITNESS: Yes.

MR. LATTY: And at that time he said he did it?

WITNESS: Yes.

MR. LATTY: And he also said it was self-defense?

WITNESS: Yes.

The State objected at this point, and the court ordered the witness' last answer stricken.

The defendant's counsel requested the court's permission to make an offer of proof, and the jury was duly excused. The discussion continued:

THE COURT: May I make the Court's position clear. You are equating what this witness said the defendant said and that was, as he recalled, Cressey threatened to kill the children and

Beverly and myself, or something of that nature as being the same as saying "I killed him in self-defense," and that is not the same as far as the Court understands the English language, or what this witness testified to, and what is meant by the words "self-defense." You are drawing a conclusion.

MR. LATTY: In answer to that, I would suggest I am not drawing a conclusion. That is not the reason for the question. The reason for the question is I believe the answer would be, "But it was self-defense."

THE COURT: You may ask the witness what, if anything, the witness said to him in addition to or other than what he has already testified to, and because there is that great danger, and I use it advisedly, when you talk self-defense which means one thing as far as we are here concerned, and it means another thing as far as someone else is concerned.

MR. LATTY: I appreciate that in view of the status of his testimony relative to what he said, I fully agree that would equate self-defense. That is not the basis for my question.

THE COURT: You may make whatever offer of proof you wish. I will permit you to ask this witness what else or if his brother did in fact say other than what he has testified to in direct examination.

The defendant's counsel apparently elected to stand by his offer of proof because, when the jury returned, he declined to ask any further questions of the witness.

■ The defendant argues that, since the presiding Justice permitted the State to introduce, on direct examination, part of the defendant's statement to his brother, the Justice should have permitted the defendant to introduce the remainder of the statement on cross-examination. This would seem to follow, the defendant suggests, from the widely recognized rule of evidence that, when part of an oral statement has been introduced by one party, the party-opponent may introduce the remainder of the statement, even though it is favorable to, or exculpatory as to, the party-opponent. VII Wigmore on Evidence (3d Ed. 1940), § 2115; *State v. Savage,* 161 Conn. 445, 290 A.2d 221, 223 (1971); *Commonwealth v. Britland,* 300 Mass. 492, 15 N.E.2d 657, 659 (1938). We have no quarrel with this general principle. See, e. g., *Storer v. Goren,* 18 Me. 174, 176–77 (1841). We think, however, that the defendant has completely misconstrued the trial court's reason for disallowing the proffered question, "And he also said it was self-defense?" As we read the pertinent portion of the record bearing on this issue, we are convinced that the presiding Justice excluded the question only because it was *improper in form.*

■ It is evident that defendant's counsel, by asking the witness to characterize the defendant's statement as a claim of self-defense, was attempting to elicit a legal conclusion from the witness. While it is too well known to require citation that leading questions are permissible on cross-examination of a witness, it is equally true that a witness should not be permitted to express an opinion that in effect would be dispositive of the issues of law in the case. *State v. Huff,* 157 Me. 269, 275, 171 A.2d 210, 213 (1961); *State v. McNaughton,* 132 Me. 8, 11, 164 A. 623, 625 (1933). We think it is immaterial that the witness here was not asked to express his own opinion, but was instead asked to *characterize* the defendant's explanation of the killing. The issue of seminal import was whether the defendant shot the victim in self-defense. It was a sound exercise of the trial court's discretion to exclude the flagrantly leading question addressed to the witness concerning the defendant's claim of self-defense. The scope of cross-examination is a matter for the discretion of the trial court and, on appeal, we will consider only whether there was an abuse of discre-

tion. *State v. Gervais,* Me., 317 A.2d 796, 800–01 (1974); *International Paper Co. v. State,* Me., 248 A.2d 749, 753 (1968). We find no abuse of discretion here.

The presiding Justice made it abundantly clear that the defendant's counsel was not prohibited from asking the witness what, if anything, the defendant said to him in addition to "I did it." As the excerpt from the record *supra* indicates, defendant's counsel chose not to rephrase his question, though the presiding Justice gave him ample opportunity to do so, but instead counsel elected to stand by his offer of proof. Whether this strategy was motivated by the hope of reversal on appeal is a matter on which we decline to speculate, but we will not reverse a conviction merely because a trial tactic backfired.

Assuming *arguendo* that we agreed with the defendant that the presiding Justice erred by excluding the testimony in question, in light of the formidable evidence pointing unerringly to the appellant's guilt, we would be constrained to hold that the defendant's substantial rights were not thereby prejudiced. See *Towle v. Aube,* Me., 310 A.2d 259, 264 (1973). The record reveals other evidence in the case which raised the issue of self-defense, and the court's charge adequately detailed for the jury the law of self-defense. In this context, the effect of the presiding Justice's ruling could only have been harmless. M.R.Crim.P. 52(a).[1]

## II.

The court's instruction on self-defense.

The presiding Justice gave, inter alia, the following instruction on self-defense:

1. M.R.Crim.P. 52(a):
 Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

2. The charge contained, for example, this sound explanation of "reasonable apprehension:"
 And finally, it isn't [the defendant's] standard that is used in judging whether or not

The law never permits the use of a firearm or any other weapon to defend against one who is not armed with another weapon capable of inflicting serious bodily harm.

The defendant objected to this instruction and reserved the point for appellate review. M.R.Crim.P. 30(b). The appellant reasons that the instruction misstates the law of self-defense by foreclosing the possibility, recognized in the law, that a person may justifiably use deadly force against an aggressor provided the person reasonably, albeit mistakenly, believes that he is in imminent danger of death or serious bodily harm. Cf. *State v. Cox,* 138 Me. 151, 166, 173, 23 A.2d 634, 642, 645 (1941); see generally 1 Wharton's Criminal Law and Procedure (12th Ed. 1957), § 215. The defendant's argument is that the instant instruction precluded the jury from considering whether the defendant entertained a reasonable belief that the deceased was about to attack him with the shotgun.

 We agree that the portion of the self-defense instruction assigned as error is, in isolation, a legally erroneous statement. We have repeatedly held, however, that the correctness of a charge must be determined by reading the charge in its entirety, not by extracting certain instructions out of it. *State v. Armstrong,* Me., 344 A.2d 42, 49 (1975); *State v. Palumbo,* Me., 327 A.2d 613, 616 (1974). Reading the charge in its entirety, and especially the instructions, other than the one in question, which were given on self-defense, it is readily apparent that the jury could not have been misled by this one brief sentence in a charge which encompasses sixty-seven pages of the record.[2]

he felt or believed that his presence there at the time he was in serious danger of bodily injury or death. We use the standard of a reasonable, logical person under those circumstances. In other words, that a reasonable, sound person of logical mind finding himself in the position the defendant found himself, would that person have believed he was in danger of serious bodily injury or

There is no indication whatever that the jury was precluded from considering whether the defendant had a reasonable belief that he was about to be attacked by the deceased, armed with a shotgun. We can only presume that the jury considered this theory, and found it to be unsupported by the evidence. We conclude, therefore, that no substantial rights of the defendant were violated by the inclusion in the charge of this one technically deficient instruction on self-defense. M.R.Crim.P. 52(a).

### III.

*The trial court's alleged expression of opinion on the facts of the case.*

■ As his final point of appeal the defendant complains of the following instruction given by the presiding Justice:

> But in any event, as you consider each piece of evidence, and as accepted as sound, credible and logical evidence, *if* it leads you to a point where you feel that this contributes to your understanding of what occurred on this particular night, you are going to put it, figuratively of course, on that board like a painting, and you are going to daub in something here and daub in something there, and put something else in another corner, somewhat like a cross-word puzzle, but a composite picture, and slowly as you assimilate and evaluate and weigh and find the truth and put it on that board, there is going to appear a picture and the picture will be of what occurred on that night of September 27, 1972. It won't be a clear picture to the extent that it will be a perfect one. There may even be a few parts missing, or it may be somewhat cloudy, but nevertheless, there is a picture you can see as though you were watching it.

> That would mean to me, *if* you can do that in your mind's eye, you have assem-

bled proof beyond a reasonable doubt (emphasis added).

The defendant urges that this instruction contains the suggestion that facts had been established which proved the defendant's guilt beyond a reasonable doubt, and that the instruction therefore violates 14 M.R. S.A. § 1105, which forbids the presiding Justice from expressing an opinion on the facts of the case in the context of his charge to the jury. We disagree. The instruction is nothing more or less than a metaphorical description of the path which the finder of fact must traverse in order to find a criminal defendant guilty beyond a reasonable doubt. The use of the conjunction "if" at the beginning and at the end of the instruction plainly indicates that the instruction was entirely conditional: *if* the jury were able to assemble a credible composite picture of the events of the night of September 27, *then* they might conclude that the defendant was guilty beyond a reasonable doubt. Moreover, the presiding Justice carefully fulfilled his exacting role and he painstakingly detailed for the jury the issues in the case. The Justice properly admonished the jury that the decision was completely within its province and that as the presiding Justice, he had no interest or desire in influencing that decision.

As we read the charge in its entirety, we are impressed with the clarity of its language and the effort of the presiding Justice to posit the issues squarely before the jury in a fashion both fundamentally fair and neutral. We are confident that the jurors, as reasonable persons specially selected for jury service in this case, were well aware of their unique and exclusive function in weighing the evidence produced before them and in determining from the evidence, the guilt or innocence of the accused. We find that the jury, so constituted, could not properly infer from the in-

death, and then acting to defend himself against that attack, have then used only such force as was reasonable and necessary

to protect himself and defend himself against that attack.

structions, any such expression of opinion in violation of 14 M.R.S.A. § 1105, as asserted by the defendant. *State v. Jewell,* Me., 285 A.2d 847, 852 (1972).

■ In determining the effect of the challenged instruction upon the validity of the respondent's conviction, we accept the well-established proposition that a single instruction to a jury will not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Armstrong, Palumbo, Jewell, supra.* The defendant's claim of error is without merit.

The entry must be:

Appeal denied.

All Justices concurring.