**STATE of Maine**

v.

**Chandler LITTLEFIELD.**

Supreme Judicial Court of Maine.

June 20, 1977.

4. 29 M.R.S.A. § 1151(4).

Joseph E. Brennan, Atty. Gen., John R. Atwood, Charles K. Leadbetter, Asst. Attys. Gen., Augusta, for plaintiff.

Romanow & Dostie by Richard M. Dostie, F. Frederick Romanow, Jr., Belfast, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

WERNICK, Justice.

Defendant Chandler Littlefield has appealed from judgments of conviction entered on September 26, 1975 in the Superior Court (Waldo County) upon jury verdicts that defendant was guilty, as charged in separate indictments, of two unlawful homicides punishable as murder (17 M.R. S.A. § 2651). The appeals have been consolidated before this Court.

The jury had warrant to find the following facts.

On December 13, 1973, a Waldo County deputy sheriff had occasion to visit the residence of Joaquin Bettencourt and Florence Bettencourt (husband and wife) in Liberty, Maine. He found Mrs. Bettencourt's body in the kitchen, and subsequent investigation led to the discovery of Mr. Bettencourt's body outside the house. It was established by autopsy that the couple had died on December 9, 1973 of gunshot wounds.

Before their deaths, Mr. and Mrs. Bettencourt had operated a used clothing store in Liberty. Mr. Bettencourt frequently carried large amounts of cash. On the night of December 9, 1973, a stormy one, Mr. Bettencourt closed the store at approximately 8:45 p. m., entered his gold Chrysler automobile and, five or ten minutes later, left the area proceeding in the direction of his house. Bettencourt's automobile was discovered on December 13, 1973, the same day police found the bodies at the Bettencourt residence. It had been abandoned several miles from the house.

On the evening of December 9, when Joaquin Bettencourt was last seen, defendant was observed in company with Thomas Morton and Charles Heald at Rolli's Bar in Belfast, Maine. The trio left at approximately 8:10 p. m., accompanied by Regina Cook, in a tan Oldsmobile owned by Marlene Roderick. Miss Cook heard conversation between defendant and Morton to the effect that they had to be at a certain place at 9:00 p. m. Red wax scrapings found in the Roderick vehicle matched similar scrapings found in the abandoned Bettencourt vehicle and candles on the porch of the Bettencourt residence.

After the events of December, 1973 leading to the Bettencourts' deaths, defendant left the State of Maine and remained elsewhere for several months. Late that December and in early 1974, he spent some time in Hollywood, Florida with Carlton Dwelley, his uncle. On February 2, 1974, defendant told Dwelley that he had murdered two people in Maine. During the following days defendant elaborated on this statement, telling his uncle that he, Charles Heald and Thomas Morton had planned to rob Joaquin Bettencourt on December 9, 1973 at approximately 9:30 p. m. when Bettencourt arrived home from the store.

Defendant described to Dwelley the events of that night at the Bettencourt residence. Defendant had shot Joaquin Bettencourt with a shotgun in front of Bettencourt's house because Bettencourt refused to give up his money and instead reached for his own pistol. When Mrs. Bettencourt appeared in the doorway, defendant shot her with both weapons. Defendant, Heald and Morton then dragged Joaquin Bettencourt's body behind the house, cut the telephone wire and took whatever cash they could find.

Shortly after making these statements to Carlton Dwelley, defendant left Hollywood and went to Orlando, Florida. He was there in contact with William A. Harvey, a long-time friend. On one occasion the two became involved in a bar-room fight which led to their incarceration in the local jail. During their imprisonment defendant described to Harvey the events at the Bettencourt residence of December 9, 1973. Defendant's "Orlando" version of the double murder substantially matched that told Carlton Dwelley earlier in Hollywood.

After relating these facts to Harvey, defendant requested that should he ever be returned to Maine for trial, Harvey smuggle a gun to him in the court house.

In addition to the facts thus revealed to the jury through evidence adduced at trial, the presiding Justice received other information in connection with a requested change of venue. Briefly, that information (which we shall explain more fully in later discussion) indicated that defendant had escaped Florida confinement in November, 1974, subsequent to the conversations with William Harvey, and traveled to San Diego, California, where he was apprehended for assaulting a police officer in May, 1975. The State of Maine initiated successful proceedings for defendant's return, and trial commenced on September 22, 1975.

*I. Motion for Change of Venue.*

Pursuant to Rule 21(a) M.R.Crim.P., defendant moved on August 25, 1975 for a change of venue from Waldo County to Lincoln County, citing allegedly prejudicial pre-trial publicity, as evidenced by an affidavit (attached to the motion) containing newspaper clippings. The presiding Justice deferred consideration of transfer pending voir dire of the jury to determine the extent of prejudice, if any, among potential jurors. After that examination the Justice denied defendant's motion.

The affidavit incorporated several dozen articles from three local newspapers covering the 20-month period from the Bettencourts' deaths in December, 1973 to defendant's forced return to Maine in August, 1975. Early accounts, written before investigation yielded a suspect, focused on the details of the crimes, the lives of the victims and the reaction of Liberty residents. After May, 1974, when indictments against defendant were returned by the Grand Jury, reporters turned to information about defendant and his activities outside Maine after the Liberty episode. Articles during the next year traced defendant's convictions for assault in Florida and subsequent escape, and his arrest for assaulting a police officer while armed in San Diego, California and his pleading guilty, there, to a "gun charge." Additionally, there were sporadic reports on the trials in Penobscot County of Charles Heald and Thomas Morton for conspiracy to rob the Bettencourts. This coverage ceased after Heald and Morton were found guilty on May 22, 1975.

None of these articles departs from a factual, low-key approach to the reported information. None prejudges defendant's guilt, calls for official action or reveals the existence of damaging, and potentially inadmissible, evidence.

However, on August 5, 1975, approximately a month and a half before commencement of voir dire, a story appearing in the Bangor Daily News did mention damaging, and possibly inadmissible, evidence. The Bangor Daily News item, covering the imminent return of defendant from California, reported two remarks about defendant attributed to the assistant attorney general in charge of the case.[1] One of the remarks described defendant as "so dangerous that he would have to travel in irons" and this prevented air travel and necessitated rendition by automobile. The second reported that

> "Littlefield has threatened to shoot his way out of any Maine court room which tried him."

Subsequent articles, written to the time of trial, covered official proceedings in the case, such as appointment of counsel, arraignment and motions.

In light of this allegedly prejudicial publicity, defendant assigns error in the denial of his motion that the trial be transferred to Lincoln County. While he apparently deals with the ruling below on grounds of abuse of discretion alone, we read his claim as encompassing an attack which is also predicated upon constitutional guarantees of due process of law.[2]

We find the Justice's ruling consistent with constitutional due process and within his sound discretion.

*A. Due Process.*

 Defendant argues that the publicity in this case so tainted the atmosphere

---

1. The State has confirmed that the remarks were in fact made as attributed.

2. Defendant does not contend that the Justice presiding erred in deferring decision on the motion for change of venue to conclusion of voir dire. In some circumstances, where pretrial publicity is of a nature that *no* jury from a particular vicinage could deliberate in an impartial manner consistent with due process of law, it would be useless to proceed to examine the venire. *Rideau v. Louisiana,* 373 U.S. 723,

83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Where, however, the effect of such publicity can only be assessed through voir dire, postponement is proper. See: *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). We expressly approved the practice where facts concerning the publicity are undisputed in *State v. Pritchett,* Me., 302 A.2d 101, 103 n. 1 (1973); see also: *State v. Heald,* Me., 333 A.2d 696, 697 (1975).

surrounding the trial that his motion should have been granted without a showing of *actual* prejudice. The Supreme Court has recognized that some pre-trial (and trial) events preclude trial in a particular location regardless of whether defendant is able to demonstrate that the jury chosen harbored actual prejudice. *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (frequent pre-trial telecasts of defendant's jail cell confession to a police officer); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (officers in charge of jury were chief prosecution witnesses); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (telecast of pre-trial motion for change of venue and live video coverage of trial itself); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (pre-trial disclosure of inadmissible evidence and names of prospective jurors; disruptive press participation during trial and lack of jury sequestration). Where circumstances endangering local impartiality do not reach this level, however, defendant must show actual prejudice among the venirepersons.[3] *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

▮ We find that the pre-trial publicity in this case falls far short of the prejudicial material which necessitated new trial in the *Rideau, Estes* and *Sheppard* cases without need for a showing of actual prejudice.[4] Here, the overwhelming majority of the newspaper articles presented a factual account of the crime and defendant's subsequent activities without banner headlines or gruesome photographs. Spread over a 20-month period, they never appeared with a frequency bound to attract attention of most members of the community. The reports did not intensify as trial neared; in fact, there was a gap of approximately a month and a half between the last articles and commencement of voir dire.

3. See n. 2, supra.

4. Defendant makes no claim of prejudicial publicity or conduct *during* trial such as the incidents complained of in *Turner, Estes* and *Sheppard*.

We view the remarks of the assistant attorney general reported in the August 5, 1975 Bangor Daily News story as highly improper and most unfortunate but insufficient, on constitutional due process of law grounds, to require a change of venue.

▮ Conduct of the prosecutor tending to jeopardize an impartial trial atmosphere cannot be condoned. *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952). In the present instance, the attorney's statements could have led a reader to prejudge defendant's guilt based on the fear with which authorities regarded him and his own resolve to escape. Further, a potential juror, apprehensive because of defendant's reported threat to "shoot his way out of . . . court room", might determine to convict regardless of guilt. Nevertheless, we conclude that the prosecutor's remarks, here, should not be a *per se* ground mandating a change of venue under constitutional due process guarantees. Defendant does not claim that the assertions were false, and, indeed, evidence was adduced at trial regarding defendant's threatened escape.[5] In the end, the August 5, 1975 article merely added one more report of defendant's unsavory, but real, activities after the Bettencourt murders. The lack of intensity of all those reports, and the one and one-half month gap following this particular story, preclude a conclusion that *any* jury drawn from Waldo County was *presumptively* prejudiced. Cf. *Patriarca v. United States*, 402 F.2d 314 (1st Cir. 1968), *cert. den.* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

It remains to assess whether, by virtue of information developed at voir dire, defendant has shown *actual* prejudice on the part of the venirepersons sufficient to require reversal under constitutional due process principles. See: *Irvin v. Dowd, supra;*

5. The introduction of this testimony is discussed briefly below.

*Murphy v. Florida*, supra. We find no such actual prejudice.

 Of the approximately 55 persons available to be jurors, forty-seven had prior knowledge of the charges. Six expressed an opinion as to defendant's guilt and were excused by the presiding Justice. All others exposed to pre-trial publicity or local discussion indicated they could serve with impartiality. Both counsel and the Court[6] inquired as to how much advance knowledge the prospective jurors had, and the effect of that exposure on their ability to serve. Most recalled little about what they had read or heard and indicated that many months had elapsed since their most recent contact with the case. Defendant did not exhaust his allotment of peremptory challenges (Rule 24(c)(3) M.R.Crim.P.).[7]

 All defendant has shown is that most of the prospective jurors, including some who served on the panel, had some prior exposure to the facts surrounding the case. It is clear, however, that some knowledge—even a preconception (which the juror avers can be put aside)—is not inconsistent with constitutional due process of law requirements. *Irvin v. Dowd*, supra, 366 U.S. at 723, 81 S.Ct. 1639; *Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

Here, defendant has not even shown preconception; rather, he merely complains of prior knowledge. In *Irvin*, 268 of 430 jurors examined had formed an opinion based on pre-trial publicity; here, only six of approximately 55 were excused on that ground. We will not presume that this small percentage indicates the remaining venirepersons had also been prejudiced. Further, the 12-person jury actually impanelled in the *Irvin* case included eight members who had admitted to previously formed opinions; the present record reveals no such taint on the jury panel.

**6.** Rule 24(a) M.R.Crim.P. See also: 15 M.R. S.A. § 1258–A; Glassman, Maine Practice § 24.2. We consider below other aspects of the manner in which voir dire was conducted.

**7.** Had the atmosphere surrounding defendant's trial been such that no showing of actual preju-

 We find the facts here more closely aligned with those in *Beck v. Washington*, supra, where the Supreme Court of the United States affirmed a conviction despite extensive accurate pre-trial publicity and indication that at least eight of 52 venirepersons had prejudged defendant's guilt. See also: *State v. Coty*, Me., 229 A.2d 205 (1967); *State v. Beckus*, Me., 229 A.2d 316 (1967); *State v. Stoddard*, Me., 289 A.2d 33 (1972); *State v. Ifill*, Me., 349 A.2d 176 (1975). Although the sufficiency of the evidence will not "cure" a tainted jury, *State v. Beckus*, supra, we note, additionally, that the evidence here fully supported the verdict, and the verdict itself was reached after a deliberation of approximately four hours. See: *State v. Hale*, 157 Me. 361, 366, 172 A.2d 631 (1961).

The denial of defendant's motion for change of venue was not a contravention of the due process of law guarantees of the United States, or the Maine, Constitution.

### B. Abuse of Discretion.

In addition to applying the standards for change of venue (and other remedies) constitutionally imposed, this Court has tested rulings on such motions in light of the permissible discretion exercisable by the trial Judge as a matter of state law. *State v. Coty*, Me., 229 A.2d 205, 211 (1967). See also: *State v. Hale*, 157 Me. 361, 172 A.2d 631 (1961); *State v. Beckus*, Me., 229 A.2d 316 (1967). Under those decisions we believe the action of this presiding Justice well within the limits heretofore developed.

In *State v. Coty*, supra, and *State v. Beckus*, supra, we approved denials of transfer in circumstances more indicative of potential prejudice than here. In *Coty*, the principal item upon which defendants relied as prejudicial was a 10 or 20 minute television "documentary" which assumed defend-

dice was necessary, his failure to exercise all his peremptory challenges would have been irrelevant since no impartial jury could have been drawn as a matter of law. *Delaney v. United States*, 199 F.2d 107, 116 (1st Cir. 1952).

ants' guilt and repeatedly referred to defendants and the crime (a double murder) in an inflammatory manner. While we described the program as

> "a remarkable demonstration of many things officials charged with law enforcement should *not* do . . . as well as many things the responsible news gatherer should *not* do", (p. 208 of 229 A.2d)

we upheld the presiding Justice's determination that the three-month gap between broadcast and trial dissipated any taint to the entire array.[8] Similarly, in the *Beckus* case we affirmed a conviction where every selected juror knew of the murder of a state trooper from pervasive pre-trial publicity and some had contributed to a fund chaired by the governor to benefit the victim's widow and children. Both these cases demonstrate that the presiding Justice acted well within discretion previously recognized by this Court. See also: *State v. Gellers*, Me., 282 A.2d 173 (1971); *State v. Collins*, Me., 297 A.2d 620 (1972); *State v. Berube*, Me., 297 A.2d 884 (1972); *State v. Pritchett*, Me., 302 A.2d 101 (1973); *State v. Northup*, Me., 318 A.2d 489 (1974); *State v. Heald*, Me., 333 A.2d 696 (1975).[9]

## II. Conduct of Voir Dire.

Defendant's contention concerning the manner in which the venirepersons were examined is directed primarily at the decision of the presiding Justice to question prospective jurors in groups of five, rather than one by one. Of the 50 members of the pool who remained after initial excuses by the Court, the first four were examined individually. Subsequently, the Judge conducted questioning of the next two candidates together without objection by defendant. When, however, the Justice next ordered that voir dire proceed by panels of five, defendant interposed vigorous objection. His objection was overruled, apparently on grounds of expediting the voir dire, and the remaining jurors were examined five at a time.[10]

Defendant claims that the resulting group examination denied him the complete inquiry to which he was entitled and inhibited the jurors from responding with full candor. Again, we read his contentions as posited both on requirements of constitutional due process and the limits of the presiding Justice's discretion as a matter of State law. We reject his arguments on both grounds.

### A. Due Process.

██ Under the Sixth-Fourteenth Amendments, the State may not deprive a defendant of the opportunity to demonstrate prejudice in the array. *Groppi v. Wisconsin*, 400 U.S. 505, 511, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971). In rare instances, the failure to question each juror separately where pervasive publicity preceded trial has been held violative of constitutional due process principles. *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968); see also: *United States v. Hearst*, 412 F.Supp. 873 (N.D.Cal.1976).

---

**8.** The sitting Justice in *Coty* excused for cause those venirepersons who remembered the broadcast.

**9.** In the past we stated that the inconvenience and expense involved in venue change indicated that they be granted sparingly. *State v. Beckus*, Me., 229 A.2d 316, 318 (1967). In light of recent statutory innovations change of venue becomes a more attractive device to avoid possible prejudice and, hence, there should be less reluctance to grant motions to change venue.

By 4 M.R.S.A. § 15, et seq., the Legislature has established a statewide administration of the Superior Court and assumed responsibility for all costs incurred after July 1, 1976. While the increased travel expense usually occasioned by change of venue will continue to occur, the new system relieves counties of such unexpected burdens. Additionally, 5 M.R.S.A. § 200–A has for some time required the Attorney General's prosecution of "homicides and such other major crimes as . . . [he] may deem necessary." Thus, in cases such as that before us transfer will not inconvenience the prosecutor since he must function on a statewide basis in any event. Cf. *State v. Coty*, Me., 229 A.2d 205 (1967) (homicide prosecuted by local County Attorney).

**10.** Actually, after eight groups of five venirepersons had been questioned only four remained, so that the final group was composed of four candidates.

■ We conclude that the pre-trial events in this case were not such as to require, under constitutional due process of law principles, individual voir dire of the persons who might become jurors. In *Silverthorne v. United States*, supra, a leading case, the publicity concerning defendant bank president was of a much more inflammatory nature than the accounts here. The press reported a Senate investigation, federal indictment and civil complaint, bizarre marital and gambling activities, and the resignation of defendant's attorney and subsequent suit against defendant for fees. The limited voir dire [11] revealed that 100% of the array had prior knowledge of the case, and 19 of 65 harbored a preconceived opinion as to defendant's guilt. The potential for prejudice was even more acute in the *Hearst* case. Cf. *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), cert. den. 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973).

We conclude that defendant has not shown circumstances in this case requiring individual voir dire as a matter of constitutional due process of law.

### B. Abuse of Discretion.

While expedition is subsidiary to the goal of impanelling an impartial jury, *United States v. Dellinger*, supra, at 370 n. 42, we nevertheless find reasonable in this case the decision of the presiding Justice to terminate individual voir dire.

As we have previously noted, the pre-trial publicity here was predominantly low-key, and removed in time from the date of trial. Moreover, counsel were permitted to conduct detailed questioning with little inter-

ference by the presiding Justice, and that questioning revealed only a few instances of actual prejudice. Thus, we believe the voir dire provided sufficient opportunity to detect predisposition in view of the limited potential for it. See: *United States v. Addonizio*, 451 F.2d 49, 65–66 (3rd Cir. 1972), cert. den. 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *Woodmansee v. Stoneman*, 133 Vt. 449, 344 A.2d 26 (1975); *Ferguson v. Commonwealth*, Ky., 512 S.W.2d 501 (1974).

■ While we thus find no error necessitating reversal here, we note, to guide future practice, that in cases where pre-trial publicity is a significant issue the better procedure would be to have individual voir dire. See: A.B.A. Standards Relating to Fair Trial and Free Press § 3.4 (Approved Draft, 1968).[12] See also: *Patriarca v. United States*, 402 F.2d 314, 317–318 (1st Cir. 1968), cert. den. 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); *Sommerville v. State*, Tenn., 521 S.W.2d 792 (1975); *Ferguson v. Commonwealth*, supra; Report of the Committee on the Operation of the Jury System, Judicial Conference of the United States, 45 F.R.D. 391, 413 (1968).

Questioning each venireperson outside the presence of the others will allow counsel to pose questions without fear of offending other potential jurors or exposing them to the publicity at issue. Additionally, the jury candidate will feel no constraint to hide from the others any prejudice actually harbored toward defendant. Should the presiding Justice find after sufficient pursuit of such individual examination that it has yielded no showing of prejudice, he may

---

11. In addition to complaining of the fact that the venirepersons were examined as a group, defendant in *Silverthorne* assigned error in the failure of the trial Judge to permit questioning by counsel, and the superficial nature of the court's own inquiry. Here, defendant's counsel conducted his own, detailed examination.

12. That section provides, in pertinent part: "Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his expo-

sure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept, by court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have."

abandon that procedure during the remaining voir dire. *United States v. Bryant*, 153 U.S.App.D.C. 72, 471 F.2d 1040 (1972), *cert. den.* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973); *United States v. Liddy*, 166 U.S.App.D.C. 95, 509 F.2d 428 (1974); *United States v. Chapin*, 169 U.S.App.D.C. 303, 515 F.2d 1274 (1975), *cert. den.* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

Defendant has also assigned various errors concerning the scope of questioning and the denial of certain challenges for cause. After close scrutiny of the voir dire transcript we find no error. Defendant was afforded wide-ranging inquiry. Of those venirepersons challenged for cause, none actually served. Defendant may have had to exercise peremptory challenges in instances where he claimed excuse for cause, but defendant did not exhaust the peremptory challenges allotted him and thus suffered no harm beyond his own power to correct. *United States v. Shaffer*, 291 F.2d 689, 695 (7th Cir. 1961).

### III. Sufficiency of the Evidence.

 By appropriate motions saving the issue of the sufficiency of the evidence to justify the conviction, defendant contests the adequacy of the evidence linking him as the perpetrator of the crimes.

After careful review of the transcript, we are satisfied that the evidence adduced amply supported a conclusion by rational jurors that defendant had committed the two crimes charged against him.

Defendant's admissions to Carlton Dwelley and William Harvey were detailed, highly probative evidence of his guilt. Further, those Florida statements were corroborated by testimony as to defendant's whereabouts and plans on the night of the crime, the connection of the Roderick vehicle to the crime scene, the locations in which the bodies were found, and the ransacked condition of the Bettencourt household. Either statement alone would have been sufficient to support findings of guilty given the underlying proof that homicides had been committed.

At oral argument defendant raised the issue that the presiding Justice erred in permitting William Harvey to testify that ". . . [defendant] asked me if he was ever brought back to Maine on this, . . . if I would hide a gun for him [in a courthouse ashtray] . . . ." Although at trial defendant had seasonably objected to the admission of this testimony, he did not perfect the issue for appellate review in ordinary course by including it in his statement of points on appeal. For the purposes of "saved" error, then, the objection was waived. Rule 39(d) M.R.Crim.P. In the context of "manifest error-serious injustice", we are satisfied that the admission of the testimony in question, if error at all, did not in all the circumstances deprive defendant of a fundamentally fair trial.

The entry is:

*Appeal denied.*

All Justices concurring.