STATE of Maine

v.

Steven R. CLARK.

Supreme Judicial Court of Maine.

May 3, 1978.

Charles K. Leadbetter (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Bennett, Kelly & Zimmerman, P. A. by Peter H. Jacobs (orally), John N. Kelly, Peter J. DeTroy, III, Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

WERNICK, Justice.

An indictment returned September 3, 1975 in the Superior Court (Knox County)

charged that on or about July 14, 1975 defendant Steven R. Clark killed Jared D. Wright in manner rendering the killing an unlawful homicide punishable as murder (17 M.R.S.A. § 2651). Tried before a jury, defendant was found guilty as charged.

We deny defendant's appeal from the judgment of conviction.

In April 1975, defendant began living with Judith Wright and her two children, Jared and Cammie. On July 14, 1975 in the morning, defendant drove Judith Wright to her place of employment and then returned home to serve breakfast to the two children. While the children were eating, defendant began to clean the house. Cammie finished eating and went outdoors. Defendant noticed that Jared, twenty-three months of age, was playing with his food. Defendant instructed Jared to eat his food. Jared did nothing but look at defendant. Shortly thereafter, defendant again walked by the table and saw that Jared was still not eating. Defendant lost his temper and hit Jared on the side of the head.[1] Defendant then continued to clean the house but soon noticed that Jared was still playing with his food. Defendant thereupon hit Jared with his fist two times, and fairly hard, in the stomach.[2] Defendant then carried Jared outside and left him standing near Cammie. A little later, Cammie came in and told defendant that Jared was "sleeping on the ground." Defendant ran outside and found Jared lying limp on the ground with his eyes half closed. Defendant took Jared inside and succeeded in reviving him with a wet washcloth.

That evening, and for the next two days, Jared displayed various symptoms of illness, including a fever and periodic nausea. During the late morning of July 16 when Jared's condition noticeably worsened, de-fendant called Mrs. Wright at work. She in turn called the emergency room at Knox County General Hospital. Jared was then taken to the hospital. He died within a few minutes after arrival at the emergency room. The cause of death was multiple trauma, or the combined effects of internal head injuries and of intraabdominal injuries which had produced an accumulation of blood in the abdominal cavity. It was only after Jared had died that defendant provided the information that he had struck the child on the head and in the stomach.

Defendant contends on appeal that the evidence is inadequate to support defendant's conviction of felonious homicide punishable as murder and the jury was influenced to return such unsupportable verdict by a combination of prejudicial factors including pre-trial publicity and venue, the emotional nature of the case and the confusing nature of the jury charge.[3]

■ At the outset, we disagree with a contention which defendant makes the foundation of his argument:—that the emotional nature of this case placed a greater burden on the trial Judge to make sure that justice was done and therefore mandates a closer *appellate* scrutiny of the issues raised by this appeal. The emotional nature of a case does not alter the obligation of the presiding Justice to provide an adequate explanation of the pertinent legal principles to the jury. The need for clarity in the jury charge is present in every case and the difficulty in charging the jury varies only with the legal complexity of the case. Accordingly, we test the adequacy of the jury charge by the ordinary standard of appellate scrutiny. Similarly, in reviewing the denial of a motion for judgment of acquittal, we must determine only whether, in

---

1. Defendant testified that the blow was harder than he had intended it to be.

2. On the day after Jared died defendant told detective Lyndon Abbott that he had struck Jared in the stomach area three or four times; at trial, however, defendant admitted striking the child in the stomach only twice.

3. Defendant asserts his contention as a unitary argument, warning that its essence is lost if it is sought to compartmentalize it into an analysis of separate issues. Because we have concluded that no error was made in any of the rulings by the Court below, we find it unnecessary to consider the "cumulative impact" of the Court's rulings or to group together for appellate consideration the readily separable issues raised by defendant's appeal.

view of all the evidence presented at trial, the jury was warranted in believing beyond a reasonable doubt that the defendant was guilty.[4]  See, e. g., *State v. McFarland*, Me., 369 A.2d 227 (1977).  Lastly, although some consideration of the emotional nature of the case may be relevant to an evaluation of the merits of defendant's motion for change of venue, the presence of this factor does not create a special standard of appellate review or cast doubt on the judgment of the presiding Justice who denied the motion for change of venue.

Having decided that there is no special brand of appellate scrutiny required for this case, we turn to consideration of defendant's argument concerning pre-trial publicity.  Pursuant to Rule 21(a) M.R.Crim.P., defendant moved on September 22, 1975 for a change of venue to a county other than Knox County, citing the allegedly prejudicial nature of the pre-trial newspaper coverage of the case in Knox County.  At a hearing on this motion on October 6, 1975, defendant presented evidence in regard to the extent and nature of the pre-trial publicity and its general effect on the community.  At the conclusion of the hearing the presiding Justice denied the motion for change of venue, but he stated that he would consider a further motion at a later time if actual prejudice on the part of the venire persons became apparent from the jury voir dire.  At the conclusion of the voir dire in October 1975, defendant renewed his motion for change of venue.  The presiding Justice again denied the motion.

As in *State v. Littlefield*, Me., 374 A.2d 590 (1977), we view defendant's claim of error in the denial of his motion for change of venue as directed to both alleged violation of the constitutional guarantees of due process of law and abuse of the discretion allowed the presiding Justice under State law.

In relation to the due process aspect of defendant's position we consider, first, defendant's suggestion that the nature of the pre-trial publicity was such that it must be taken, per se, to have precluded a fair and impartial jury in Knox County, and therefore no showing of actual prejudice to defendant should be required.

The pre-trial publicity in this case consisted of approximately two dozen articles from three newspapers covering the two month period from defendant's arrest on July 17, 1975 through his arraignment on September 11, 1975.  With the possible exception of articles dated August 19, 1975, all of the articles " 'met every reasonable standard of fair reporting' ", *State v. Pritchett*, Me., 302 A.2d 101, 104 (1973), *State v. Berube*, Me., 297 A.2d 884, 886 (1972), and they were " 'straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness.' " *State v. Coty*, Me., 229 A.2d 205, 212 (1967), quoting from *Beck v. Washington*, 369 U.S. 541, 556, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

Dealing separately with the articles of August 19, 1975, we discern that compared with the other published articles they presented a somewhat greater threat to the prospect of securing a fair and impartial jury in Knox County.  The August 19th articles summarized the evidence presented by the State at the probable cause hearing, including references to a confession by the defendant and to various statements by several doctors ruling out the possibility of an accidental death and claiming that it looked as if the child was "hit with bricks or something."  (As to this last statement about "bricks", the newspaper which had printed it published, on September 11, 1975, an article correcting the story, explaining as the true situation that Mrs. Wright had made a statement that in her conversation with the doctors "it hit her like a ton of bricks.")

4.  In regard to the possible effects on the jury of the emotional nature of the case, the presiding Justice cautioned the jury at the outset of his charge to make the determination of the facts free from the influence of any passion, prejudice or emotion of any kind.  In addition, we note that defendant does not suggest that any of the evidence had any tendency to influence the jury on an improper basis.  See Rule 403 M.R.Evid.; *State v. Hurd*, Me., 360 A.2d 525 (1976).

While acknowledging that the August 19th articles exceeded the ordinary scope of news coverage and could be taken as "prejudicial" to the defendant, the presiding Justice nevertheless saw fit to deny the motion for change of venue.[5]

Reviewing the presiding Justice's ruling in the framework which we are now postulating—that the nature of the articles was such as per se to preclude securing an impartial jury in Knox County, without need for a showing that defendant suffered actual prejudice—we note at the outset that there was no saturation of prejudicial news coverage in Knox County. Even as to the articles published by the newspapers on August 19, 1975, in each newspaper there was only a single article which attempted to summarize the testimony presented at the probable cause hearing. These articles were before the public more than two months before the inception of the trial. In addition, the articles contained no requests or demands for action against the defendant or sensational expression of opinion as to the guilt or innocence of the defendant. The publicity was all of a pre-trial nature. No prejudicial incidents occurred during the course of trial such as in other cases have served as presumptive evidence of an unfair trial.[6] See, e. g., *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (carnival atmosphere resulting from press disruption during trial and lack of jury sequestration); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (televised trial); *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (jurors in custody of deputies who were the chief prosecution witnesses). Even the August 19th articles were largely factual and as a whole were not invidious or inflammatory in effect. See *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). Although in some cases the nature of the pre-trial publicity itself may be so prejudicial and extraordinary as to mandate a change of venue, see *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (public exposed three times to televised spectacle of defendant personally confessing in detail to the crimes charged), we conclude that the nature of the publicity here was not so inherently and pervasively prejudicial as to require a change of venue in the absence of a showing of actual prejudice.[7]

---

**5.** Since the presiding Justice refused a change of venue, we interpret his statement about prejudice to defendant as signifying that the articles in the abstract had some potential for prejudice but were not so presumptively prejudicial as to require a change of venue.

**6.** Defendant does suggest that the impartiality of the actual jury was tainted by the comments of a prospective juror during voir dire that no child "would be worthy of punishment like this child had." The presiding Justice refused to excuse the entire array in the absence of a showing that the remarks actually influenced the other prospective jurors. His subsequent specific inquiries established that the jurors were not so influenced. We agree that this single remark by a prospective juror did not constitute such pervasive and presumptive prejudice as, per se, to make the trial unfair.

**7.** At the pre-voir dire hearing on the motion for change of venue, defendant attempted to establish the necessary degree of presumptive prejudice by introducing the results of a special telephone survey or poll conducted in Knox County at defendant's request. The results of the survey indicated that 83% of the 200 eligible voters interviewed remembered having seen, heard or read something about an incident involving the beating death of a two year old child in Union; another 4% remembered the incident when the names of defendant and the decedent were mentioned; 67% remembered having seen, heard or read something about defendant being charged with murder in connection with the death of the child; 19% had formed an opinion as to defendant's probable guilt or innocence; 16% believed that defendant was probably guilty of a crime in connection with the child's death; 17% had read something (or believed they had) about defendant being guilty of a crime in connection with the incident; and 8% had both read and heard something about defendant being guilty.

The presiding Justice concluded that the results of the poll indicated the likelihood of obtaining a fair trial for defendant in Knox County.

We take this occasion, however, to express the caveat that Superior Court Justices should proceed with extreme caution in taking cognizance of the results of surveys of the type here made. We think that such surveys should not be encouraged since in the very process of conducting them in advance of trial there may be potential for the creation of prejudice.

■ Defendant has failed to demonstrate any actual prejudice on the part of the venirepersons sufficient to require reversal as a matter of constitutional due process. Of the 116 persons in the pool of persons summoned for the jury voir dire, only 26 admitted to having formed an opinion as to defendant's guilt or innocence and all 26 were excused "for cause" by the presiding Justice. None of the 12 jurors and 2 alternatives finally selected expressed any preconceived notions in regard to defendant's guilt or innocence, and all expressed a willingness to be fair and impartial. In fact, no members of the final panel were challenged for cause by the defendant, a circumstance which is "strong evidence" that defendant was convinced that the jurors were not biased and had not formed any opinions as to guilt. *Beck v. Washington,* 369 U.S. 541, 557, 558, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). The mere exposure of the jurors to the pre-trial publicity in this case is not a sufficient indication of actual prejudice or fundamental unfairness. *State v. Littlefield,* Me., 374 A.2d 590 (1977) (and cases cited therein); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

■ We also reject defendant's contention that the presiding Justice, in denying the motion for change of venue, exceeded the scope of permissible discretion exercisable as a matter of state law. See *State v. Littlefield,* Me., 374 A.2d 590 (1977). The denial of the motion for change of venue was fully consistent with the requirements of state law. See *State v. Littlefield,* supra; *State v. Coty,* Me., 229 A.2d 205 (1967); *State v. Beckus,* Me., 229 A.2d 316 (1967).[8]

■ Having decided that the presiding Justice did not err in denying the motion for change of venue, we turn now to consideration of defendant's argument that the jury charge as a whole was erroneous and prejudicial to defendant. Acknowledging that each individual statement of law in the charge to the jury may have been, within its own confines, a correct statement of the law, defendant contends that the charge as a whole was confusing because of the intertwining of various concepts and categories such as murder and manslaughter, and intent and the absence of intent.

We reject this argument. We have examined the charge in its entirety and have found it sufficiently clear, logical and precise. The presiding Justice first structured his charge around the three components of felonious homicide punishable as murder (as here applicable). He proceeded logically from the requirement of a killing to its unlawful nature (therein explaining the concepts of justifiable and excusable killings) and finally concluded with an explanation of the "intent" requirement or its objective equivalent. The presiding Justice then instructed the jury in regard to involuntary manslaughter and other lesser included offenses.[9] Although at one point during his explanation of murder and the concept of an unexcused killing, the presiding Justice injected a comment as to the State's burden in regard to proving the lesser offense of manslaughter, this digression was not prejudicial. The purpose of the digression was only to point out that an excusable killing is punishable neither as murder nor manslaughter. In light of subsequent instructions given as to the punishment categories of murder and manslaughter and various curative instructions which the presiding Justice gave, we conclude that the charge as a whole was adequate.

Moreover, the empirical data revealed by the survey may divert the attention of the presiding Justice from the critical constitutional question of whether, independently of its actual effects, the pre-trial publicity was in itself of such nature as *presumptively* to preclude the possibility of a fair trial.

8. In *State v. Littlefield,* supra, we suggested in footnote 9 that, in consequence of recent statutory innovations, considerations of expense and inconvenience should have less influence on the venue decision. The trial in this case, however, preceded our opinion in *Littlefield.*

9. Defendant agreed that the presiding Justice should not instruct the jury in regard to the offense of felonious homicide punishable as "voluntary" manslaughter.

One other issue raised by defendant, concerning instructions given to the jury after the jury had made a request for additional instructions, requires further comment.

After the Justice completed his initial charge to the jury, he conferred with counsel and then gave the jury a curative instruction in regard to involuntary manslaughter. Defense counsel indicated satisfaction with the curative instruction. The jury then retired to commence its deliberations. Two hours later, the jury returned and requested *written* definitions of "murder, manslaughter, assault and battery, high and aggravated, and simple assault and battery." The presiding Justice refused this request, but he indicated to the jury that he would grant a request for further oral instructions. The jury again retired and returned to the courtroom shortly thereafter with a request for further instructions "in reference to the part of the intent, part of being defined in the three different aspects as to the intent." In response, the presiding Justice instructed the jury only in regard to intention, or its objective equivalent, as each is related to the punishment category of murder.[10]

Defendant then renewed his objection that the charge was confusing, and defendant also objected that the Court should have further instructed the jury about intention in manslaughter. The Court refused, explaining that intention is not involved in manslaughter. Defendant then agreed to a proposal by the presiding Justice that earlier instructions be repeated. When the jury again requested instructions as to the elements of murder and manslaughter, the

presiding Justice had the stenographer read back to the jury the full version of the original instructions in regard to murder and manslaughter and also the first curative instruction. Defendant then made a further request that since, as defendant viewed the situation, the jury's action showed that the jury was confused, the Justice should undertake anew to clarify for the jury the concepts of manslaughter and criminal negligence. The Justice refused this request. The jury then retired and, after two and a half hours of further deliberations, returned its verdict.

Defendant claims that it was error for the presiding Justice to refuse to clarify the concepts of manslaughter and criminal negligence after the jury had asked for further instructions in regard to the "three aspects of intent."

We conclude that the presiding Justice acted without error in relying on his original instructions to the jury. The Justice had twice explained to the jury that an unlawful killing was punishable as murder in the circumstances of this case only if the defendant had an actual subjective intent, desire or purpose to kill or if, alternatively, absent

> ". . . actual intent . . . to kill, his conduct is characterized by a high, death-producing potential and demonstrates a wanton and willful disregard by him of the obvious likelihood of causing serious bodily injury or death. Such conduct has the equivalent effect of an actual intent, desire or purpose to kill."

In his first curative instruction, which also had been twice presented to the jury, the presiding Justice had explained that

> "Now, in other words, the first characterization is called a subjective intent, where there was an actual intent in the mind of the individual, an actual intent, desire or purpose to kill. The second definition or characterization of intentional is more of an objective standard, where, although there was no subjective actual intent, desire or purpose to kill, the conduct is characterized by a high potential for producing death and demonstrates a wanton and willful disregard of obvious likelihood of causing serious bodily injury or death."

---

10. The Justice instructed that:

"A killing is characterized as intentional if, first, the killer had an actual intent, desire or purpose to kill. That is, that death should result from his conduct or, second, although the killer had no actual intent, desire or purpose to kill, his conduct is characterized by a high death-producing potential and demonstrates a wanton and willful disregard of the obvious likelihood of causing serious bodily injury or death. Such conduct has the—and that is the second conduct that I referred to—has the equivalent effect of an actual intent, desire or purpose to kill.

"if that killing is shown and the jury is satisfied [that it] was an unintentional killing, . . . to find the defendant guilty of manslaughter you must find that he acted in a manner which evidenced a reckless disregard for the life and safety of another."

The curative instruction further explained that such "reckless disregard" requires the State to prove more than that defendant was negligent. As the Justice stated it:

"Proof of ordinary negligence, that is, that the defendant did not act as a reasonably prudent person would have acted under the same or similar circumstances, is not sufficient for you to find the defendant guilty of manslaughter. The standard of reckless disregard for the life and safety of another is a heavier burden for the State to prove than mere negligence. And, to return a verdict of guilty of manslaughter you must find beyond a reasonable doubt that the State has met this burden."

In view of these instructions, and the charge as a whole, we find that the Court adequately differentiated between the unlawful homicide which is punishable as "involuntary manslaughter", as predicated on criminal negligence, see *State v. Hamilton,* 149 Me. 218, 100 A.2d 234 (1953), *State v. Ela,* 136 Me. 303, 8 A.2d 589 (1939), and the unlawful homicide which is punishable as "murder", as resting on brutal or reckless and willful conduct which, objectively viewed, has high capability to cause death. *State v. Ellis,* Me., 325 A.2d 772 (1974); *State v. Lafferty,* Me., 309 A.2d 647, 671, 672 (1973). By the repetition of the instructions the Justice made sufficiently clear the difference between "criminal negligence" as giving rise to "involuntary manslaughter" and the "intent" to kill, actual or attributed, which would make an unlawful homicide punishable as murder. We conclude that no error resulted from the instructions to the jury.

█ As a final point of appeal, defendant attacks the sufficiency of the evidence to support the verdict of unlawful homicide punishable as murder. Defendant contends that as a matter of law his conduct must be characterized, at worst, as "criminal negligence", and therefore, if defendant committed an unlawful homicide, it was only such as is punishable as "involuntary manslaughter."

Under the law applicable (as relevant in the circumstances of this case) at the time of the unlawful killing, defendant could properly be found guilty of unlawful homicide punishable as "murder" if either (1) defendant caused the death of another, defendant having actual subjective intention that death should result from his conduct or (2) defendant caused the death of another by conduct which, objectively evaluated, has high capability to produce death or manifests a wanton and willful disregard of the risk of death as a result of the conduct. *State v. Ellis,* Me., 325 A.2d 772, 776 (1974); *State v. Lafferty,* Me., 309 A.2d 647, 671, 672 (1973).

Acting as an appellate court to review the sufficiency of the evidence, we are not to act as fact-finders in the first instance; it is the jury's judgment, so long as it is a rational judgment, which must govern. *State v. Blier,* Me., 371 A.2d 1091, 1093 (1977); *State v. Bonney,* Me., 351 A.2d 107, 110 (1976). Here, defendant himself admitted in his testimony at trial, that he first struck Jared, a twenty three month old child, in the head and then shortly thereafter, twice used his fist to strike the child "fairly hard" in the stomach. The jury was justified in finding that defendant's conduct was brutal conduct which, objectively evaluated in all the circumstances, had high capability to cause Jared's death.

The entry is:

Appeal denied.

Judgment affirmed.

NICHOLS, J., did not sit.