**STATE of Maine,**

v.

**Jeffrey JOHNSON.**

Supreme Judicial Court of Maine.

Argued June 18, 1984.

Decided Aug. 13, 1984.

Paul Aranson, Dist. Atty., Laurence Gardner, Asst. Dist. Atty. (orally), Portland, for plaintiff.

Richardson, Tyler & Troubh, John S. Whitman (orally), Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

After a jury trial in Superior Court (Cumberland County) defendant Jeffrey Johnson was convicted of one count of manslaughter, Class C, 17–A M.R.S.A. § 203 (1983) (current version at 17–A M.R.S.A. § 203 (Supp.1983–1984)),[1] and two counts of aggravated assault, Class B, 17–A M.R.S.A. § 208 (1983). He now appeals, contending that the presiding justice erred 1) in denying his motion for a change of venue and 2) in admitting hearsay testimony. Finding no merit in these contentions, we deny the appeal.

On December 8, 1982, defendant was indicted by a Cumberland County grand jury for one count of manslaughter and two counts of aggravated assault. Those charges stemmed from an automobile accident that occurred on November 19, 1982, on Blackstrap Road in Falmouth. The accident involved a collision between two cars, one occupied by defendant and his brother, Joseph Johnson, and the other occupied by Dr. Robert Sbrilli, his wife, Beverly, and their daughter, Laurie. As a result of the accident Dr. and Mrs. Sbrilli were seriously injured and Laurie was killed. There was evidence that the Johnson brothers had consumed a substantial quantity of alcohol before the accident and that their car was being operated in a reckless manner.

1. P.L.1983, ch. 217, effective September 23, 1983, changed manslaughter occurring as a result of the reckless or criminally negligent operation of a motor vehicle from a Class C to a Class B offense.

## I. *Juror Prejudice*

Three weeks prior to trial defendant filed a motion pursuant to M.R.Crim.P. 21(a) seeking a change of venue from Cumberland County on the ground of prejudicial pretrial publicity. The presiding justice deferred consideration of the motion pending voir dire and selection of the jury. On the first morning of trial, after voir dire and jury selection had been completed, the presiding justice denied defendant's motion. On appeal defendant argues that the record demonstrates that the jury panel was so affected by pretrial publicity that it was impossible for him to receive a fair trial without a change of venue.

■ We will reverse the trial court's denial of a motion for a change of venue based on juror prejudice in three circumstances: 1) when the publicity in the case so taints the atmosphere surrounding the trial that it must be presumed under principles of constitutional due process that the jury was prejudiced; 2) when the defendant demonstrates actual prejudice on the part of the venirepersons sufficient to require reversal as a matter of due process; or 3) when denial of the motion amounted to an abuse of discretion under state law. *See State v. Ledger*, 444 A.2d 404, 408–09 (Me. 1982); *State v. Grant*, 418 A.2d 154, 157–58 (Me.1980); *State v. Clark*, 386 A.2d 317, 319–21 (Me.1978); *State v. Littlefield*, 374 A.2d 590, 593–96 (Me.1977).

### A. *Presumptive Prejudice*

It is well established that

[a] due process violation can occur when the publicity surrounding the case is of such an extensive and invidious nature as to constitute prejudice per se, in which case actual prejudice need not be shown.

*State v. Ledger*, 444 A.2d at 408 (quoting *State v. Grant*, 418 A.2d at 158); *see State v. Tracy*, 415 A.2d 824, 827 (Me.1980); *State v. Clark*, 386 A.2d at 319–20; *State v. Littlefield*, 374 A.2d at 593–94; *State v. Ifill*, 349 A.2d 176, 179–80 (Me.1975).

Thus, in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), where, prior to the selection of the jury the public was exposed to repeated telecasts of the defendant's detailed confession to the police, the United States Supreme Court, "without pausing to examine a particularized transcript of the *voir dire* examination," held that due process mandated a change of venue. *Id.* at 727, 83 S.Ct. at 1419 *see also Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (pretrial disclosure of inadmissible evidence and names of prospective jurors as well as disruptive press participation during trial and lack of juror sequestration).

■ Any argument that defendant may have that the publicity in this case was so prejudicial as to render a fair trial within Cumberland County an impossibility is defeated by defendant's failure to make a record of any pretrial publicity. *See State v. Grant*, 318 A.2d at 157–58; *cf. State v. Clark*, 386 A.2d at 319; *State v. Littlefield*, 374 A.2d at 593; *State v. Ifill*, 349 A.2d at 179; *State v. Beckus*, 229 A.2d 316, 317 (Me.1967); *State v. Coty*, 229 A.2d 205, 208 (Me.1967) (record of pretrial publicity made in Superior Court). The only indication of pretrial publicity in the record, other than the responses of venirepersons that will be discussed below, consists of a non-testimonial statement made by defense counsel on the first day of trial that he had seen an inflammatory television news broadcast about the case the evening before. According to defense counsel, the broadcast cited "unnamed court sources" as saying that Joseph Johnson had agreed to take a blood-alcohol test following the accident but Jeffrey had refused one, and also stating that Jeffrey was contending that Joseph had been the driver of the car. The presiding justice acknowledged that he too had seen a news broadcast in which statements and information were attributed to a court source. The justice did not, however, confirm defense counsel's account of the contents of the broadcast.

■ Even if defense counsel's statement could be considered sufficient to place the contents of the news broadcast in the record, the existence of the broadcast, standing alone, fails to demonstrate that pretrial publicity in the case was sufficiently extensive or invidious to render any jury drawn in Cumberland County presumptively prejudiced. *See State v. Ledger*, 444 A.2d at 408. According to defense counsel's account of the broadcast, it did contain potentially inadmissible evidence that was prejudicial to defendant. However, the inflammatory potential of the broadcast was far less than that posed by the publicity present in cases such as *State v. Coty, State v. Clark*, and *State v. Littlefield*, where this court upheld denials of motions for change of venue. More importantly, the broadcast was not aired until after the jury had been selected and had been instructed by the court not to watch television news. None of the jurors selected to sit on the case saw the broadcast.

## B. *Actual Prejudice*

■ Where the circumstances endangering community impartiality do not reach the level where it must be presumed that any jury drawn from the locale is prejudiced, the defendant must show actual prejudice among the venirepersons. *See Murphy v. Florida*, 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2035–2036, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *State v. Clark*, 386 A.2d at 321; *State v. Littlefield*, 374 A.2d at 594; *State v. Stoddard*, 289 A.2d 33, 35 (Me.1972). Of the 52 prospective jurors in the original panel, 33 had some knowledge of the case and 15 had formed some opinion about the case. Although these figures indicate considerable public awareness, they are not out of line with those present in cases such as *State v. Littlefield*, 374 A.2d at 595 (47 of 55 prospective jurors with knowledge of the charges), and *State v. Clark*, 386 A.2d at 321 (26 of 116 prospective jurors with opinion about case), in which we have rejected

assertions of actual prejudice. In any event, "some knowledge—even a preconception (which the juror avers can be put aside)—is not inconsistent with constitutional due process of law requirements." *State v. Littlefield*, 374 A.2d at 595 (citing *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1642; *Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962)); *see State v. Ledger*, 444 A.2d at 409. Significantly, only 2 of the 52 potential jurors felt they would be unable to render a fair verdict. We are unable to conclude from these figures that the

> examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law.

*Beck v. Washington*, 369 U.S. at 557, 82 S.Ct. at 964.

Turning to the jurors actually selected to sit on the case, none of those 14 jurors had an opinion about the case, and only 3 of the 14 had any knowledge of the case. Of those 3 jurors who had knowledge of the case, one was never challenged for cause, and challenges for cause made against the other 2 were withdrawn by defense counsel. *Cf. id.* at 557–58, 82 S.Ct. at 964; *State v. Clark*, 386 A.2d at 321. Defendant used three of his peremptory challenges against jurors with no prior knowledge of the case.

■ Defendant makes much of the fact that all but 7 of the original panel and all but 2 of the 14 jurors selected had heard of the organization known as Mothers Against Drunk Driving (MADD). Defendant contends that these statistics are significant because of an alleged connection between the case, the Sbrillis, and MADD. However, defendant is able to point out only one venireperson, who incidentally was not selected, who was aware of any connection between MADD and the case. We cannot conclude that a showing of *mere awareness* on the part of the jury of a well-known organization such as MADD

is sufficient to demonstrate actual prejudice requiring reversal as a matter of constitutional due process.

### C. *Abuse of Discretion*

Denial of a motion for change of venue may also be reversed on the ground that such denial exceeded the scope of permissible discretion exercisable under state law. *State v. Grant*, 418 A.2d at 158; *State v. Clark*, 386 A.2d at 321; *State v. Littlefield*, 374 A.2d at 595; *State v. Coty*, 229 A.2d at 210–13. The Superior Court's denial of defendant's motion in this case fell well within the discretionary limits established by our earlier decisions.

### II. *Evidentiary Ruling*

The principal issue contested at trial was whether defendant was driving his car at the time of the accident. In the early afternoon of the day of the accident defendant visited with his brother, Joseph Johnson, and his brother's girlfriend, Kathleen Bonville, at Bonville's apartment in Portland. During the two-hour visit the three of them split a pint of peach brandy. The brothers left around 2:15 p.m. in Jeffrey's car to go to the camp of a friend, Larry Lare, on Forest Lake in Windham, in order to pick up some firewood. By his own admission, defendant was at the wheel. However, it was during the return trip from Lare's camp back to Portland that the accident occurred.

The State called Vicki Rogers, who testified that at about 3:15 p.m. on the day of the accident she was backing out onto Forest Lake Road from her driveway, a two-minute walk from Larry Lare's camp, when she saw a car matching the description of defendant's Oldsmobile coming towards her *from the direction* of Lare's camp. She saw Joseph Johnson in the passenger seat and Jeffrey behind the wheel. Other State's witnesses testified as to the reckless operation of defendant's car as it proceeded south on Blackstrap Road but were unable to identify with certainty which of the occupants of the car was driving.

Craig Millett, however, witnessed the collision of the Johnson car and the Sbrillis' Volkswagen. Upon the collision, Millett observed someone fly out of the passenger side window of the Johnson car and land on the roof, where Joseph Johnson was found.

The State also called Larry Lare, who testified that he was at his neighbor's house on the day of the accident, when, at some point during the afternoon, he saw Jeffrey Johnson's car parked in his driveway with Joseph Johnson standing by the rear passenger side of the car. Lare went out to where the car was parked, but by the time he got there the car was backing out of the driveway. He testified that he could not see who the driver of the car was and that he did not see Joseph get into the car on the passenger side. However, Lare was impeached by the prosecutor with a statement that he had made to Lieutenant David Kloth of the Falmouth Police Department four days after the accident. After acknowledging that the statement was written in his handwriting and contained his signature, Lare without objection from the defense read into the record his following statement:

> On 11–19–82, I, Larry Lare, saw green Oldsmobile of Jeff Johnson leave my yard with Joe Johnson getting in the passenger side of the car. I did not see the driver. I am not sure of the time.

When the defense began its case on the third day of trial, defendant sought to impeach Lare's credibility. Defendant called Lieutenant Kloth and inquired about the various accounts Lare had given Kloth regarding the events on the day of the accident:

Q. [by defense counsel] During the course of your investigation of this case, you testified earlier, I believe, that you talked with Larry Lare, took a statement from him, is that right?

A. Yes, I did.

Q. In fact, you talked to him several times, didn't you?

A. Yes, I did.

Q. And each time you talked with him, he gave you essentially a different story?

A. Basically.

Q. Without saying what he told you, he did tell you something different almost every time you talked to him?

A. Basically it was the same story.

Q. Yes or no. He told you something different every time you talked to him?

A. Yes, he did.

On cross-examination by the State, Kloth reiterated that Lare's story had remained basically the same. Kloth was then asked, "[W]hat was it [Lare] always said?" Defendant's objection to the question was overruled, and Kloth testified as follows:

Consistent thing being that he saw the Johnson vehicle in his driveway and that vehicle left his driveway with Joseph Johnson in the vehicle. He [Joseph] was beside the vehicle, and then, in the passenger seat when the vehicle left.

Defendant immediately moved for a mistrial. The presiding justice denied the motion, but instructed the jury that Kloth's testimony regarding Lare's statements should be considered only to determine issues of credibility and not for the truth of the matter asserted.

■■■ Defendant contends that Kloth's testimony regarding the consistencies in Lare's statements was inadmissible hearsay. Hearsay evidence is inadmissible except as provided by law or by the Maine Rules of Evidence. See Sargent v. Coolidge, 399 A.2d 1333, 1345 n. 4 (Me.1979); M.R.Evid. 802. However, the general rule excluding hearsay and the exceptions to the general rule are inapplicable unless the challenged evidence falls within the definition of hearsay: an out-of-court statement offered in evidence for the truth of the matter asserted. M.R.Evid. 801(c); see State v. Hudson, 325 A.2d 56, 64 n. 6 (Me.1974); State v. O'Clair, 292 A.2d 186, 194 (Me.1972). The initial inquiry there-

fore must be the purpose for which the out-of-court statement is offered and admitted.

■■ In the instant case the presiding justice specifically instructed the jury not to consider the statement challenged by defendant for the truth of the matter asserted; he instructed the jury to consider the statement only for purposes of evaluating the credibility of Larry Lare. We agree that the challenged testimony was admissible for this non-hearsay purpose. More specifically, the testimony was admissible for the purpose of clarifying the potentially misleading testimony the defense had elicited from Lieutenant Kloth on direct examination in order to impeach Lare's credibility.

We begin with the testimony of Lare himself. On the stand Lare claimed that although he had seen Joseph Johnson standing on the passenger side of defendant's car, he never saw Joseph get into the passenger side of the car. However, Lare subsequently read into the record without objection his own handwritten statement in which he stated that he had seen Joseph in the passenger seat when the car left. Thus, the central issue addressed in Lare's testimony and practically the only issue addressed by the statement that he read to the jury was whether he had in fact previously stated he had seen Joseph in the passenger seat of the car.

Defendant sought to impeach Lare's credibility. He called Lieutenant Kloth, who had earlier testified for the State, and questioned Kloth regarding defendant's various accounts of the events of the day of the accident. Although Kloth attempted to maintain that Lare's story had remained basically the same, he conceded at defense counsel's prompting that Lare had told him something different every time the two had spoken together. Given the fact that Lare's testimony and the statement that he read to the jury both focused on the issue of whether he had seen Joseph Johnson get into the passenger side of the car, Kloth's

concession that Lare had told him something different each time the two had spoken would lead the jury to believe that Lare's out-of-court statements had varied as to whether Lare had seen Joseph in the passenger seat. Kloth's further testimony on cross-examination clarifying the fact that Lare's out-of-court statements had remained consistent on that critical issue was admissible to dispel the misleading effect of his earlier testimony elicited by defendant.

 It is well established that where part of a statement has been introduced by one party, the party opponent may introduce the remainder of the statement, even though favorable to the party opponent's case. *See State v. Burnham,* 427 A.2d 969, 971–72 (Me.1981); *State v. Ryder,* 348 A.2d 1, 4 (Me.1975); *Storer v. Gowen,* 18 Me. 174, 176–77 (1841); *see also* E. Cleary, *McCormick's Handbook of the Law of Evidence* § 56, at 130 (2d ed. 1972); 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 106[01], at 106–2 (1972); 7 J. Wigmore, *Evidence* § 2113, at 653 (Chadbourn ed. 1978). The purpose of the rule is to prevent the misunderstanding and confusion that may be occasioned by incomplete recitation of a statement or by "wresting a part of … a body of expressions out of its context." E. Cleary, *supra* § 56, at 130. While that completeness rule with respect to writings is explicitly stated in the Maine Rules of Evidence, M.R.Evid. 106, our decisions recognize that the rule applies to oral statements as well. *See State v. Ryder,* 348 A.2d at 4. Although the remainder of a statement, introduced pursuant to the rule of completeness, may itself be admissible for some independent reason, it may also come in for the limited purpose of removing the misleading effect of the fragment already introduced. *See* R. Field & P. Murray, *Maine Evidence* § 106.1, at 25 (1976) (the remainder is admissible "in order to explain or rebut the unfavorable inference which might arise from introduc-

tion of the fragment"), *quoted in State v. Burnham,* 427 A.2d at 971–72; J. Wigmore, *supra,* § 2113(c), at 659.

The situation posed by Lieutenant Kloth's testimony is closely analogous to that addressed by the rule of completeness. On direct examination by defendant, Kloth was asked to characterize Larry Lare's out-of-court statements in an inherently misleading way. Given the focus of Lare's testimony and his statement that he read to the jury, and given the conflict between Lare's testimony and statement, Kloth's concession that Lare said something different each time the two spoke could naturally be interpreted as indicating that Lare had vacillated as to whether he had seen Joseph get in the passenger side of the car. The presiding justice was fully justified in allowing Kloth to dispel that potential misconception.

The entry is:

Judgment affirmed.

All concurring.